760 P.2d 1050

**Dewey D. SCHADE,**
**Plaintiff/Counter–Defendant/Appellee,**

v.

**Edward DIETHRICH, M.D., AHI Cardio-**
**vascular Surgeons, Ltd., a professional**
**corporation,        Defendants/Counter–**
**Claimants/Appellants.**

**No. CV–87–0072–PR.**

Supreme Court of Arizona,
En Banc.

July 19, 1988.

Motion for Reconsideration Granted and
Opinion Modified Sept. 20, 1988.

Ely, Bettini & Ulman by Herbert L. Ely, J. Wayne Turley, Eileen S. Willett, Phoenix, for plaintiff/counter-defendant/appellee.

Goldstein, Kingsley & Myres, Ltd. by Philip T. Goldstein, Pamela L. Kingsley, Phoenix, for defendants/counter-claimants/appellants.

FELDMAN, Vice Chief Justice.

Edward B. Diethrich, M.D. seeks review of a court of appeals' decision that his promise to develop an "equitable and fair separation agreement" for employee Dewey D. Schade was enforceable on the basis of promissory estoppel. *Schade v. Diethrich*, No. 1 CA–CIV 8478 (Ariz.Ct.App. Jan. 15, 1987). We granted review to consider the following issues:

1. Whether Diethrich's promise was enforceable and on what theory;

2. If Schade was entitled to recover, did A.R.S. § 23–355 permit the trial judge to treble the damages;

3. Whether Schade was entitled to prejudgment interest;

4. Whether Schade was entitled to attorney's fees.

We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Edward B. Diethrich (Diethrich) is a heart surgeon, founder of the Arizona Heart Institute (Institute),[1] and guiding spirit behind its nonprofit edu-

---

1. Arizona Heart Institute is the collective name for three legally distinct entities. They include AHI Cardiovascular Surgeons, Ltd., the codefendant here, which is Diethrich's professional corporation devoted to surgery. They also include the Arizona Heart Institute, Ltd., a professional corporation devoted to diagnostic services, and Video Arts Studio, a media production company. All are wholly owned by Diethrich.

cational and research corporation, the International Heart Foundation (Foundation).[2] At all times relevant to this action, Diethrich was president of the Institute and president, medical director, and board member of the Foundation.

In August 1972, the Institute hired Dewey D. Schade (Schade) as assistant to its director, Diethrich. Schade's starting salary was $20,000. Diethrich's organization was then in its infancy, having been incorporated only six months earlier. Diethrich appreciated Schade's work and within five years Schade's salary tripled and he rose to executive vice president and chief administrative officer of the Institute. In July 1981 Schade moved, on paper at least, to the Foundation. He became its executive vice president and chief operating officer. However, Schade continued to work for the Institute after July 1981 and his salary was split between the two entities.[3] At the time of his "resignation" in November 1982, Schade was earning $84,000 per year.

On November 15, 1982 Diethrich asked for Schade's resignation. He claimed Schade had lost support among some important Foundation board members. In consideration of the resignation he offered "a very generous and fair separation agreement that reflects the contributions that you have made to this organization, to the Institute, and to me over this 10 year period." Reporter's Transcript (RT), Apr. 9, 1985, at 74–75. Schade was reluctant to resign. Moreover, he doubted Diethrich's ability to be fair under the circumstances and voiced his doubts to Diethrich's attorney, Paul Meyer, on the same day.[4] In response to Schade's concerns, Meyer proposed the appointment of a committee of the Foundation's board to recommend a severance package. Meyer reasoned that many members of the board were business people familiar with personnel practices involving senior executives, their compensation packages, and severance agreements.

Appointment of the committee would both relieve Diethrich of the burden of determining what was fair and ensure that the package offered Schade was equitable.

When Schade met with Meyer the next day, Meyer related Diethrich's approval of the plan to have a committee appointed and Diethrich's intention to personally ask the Foundation's board chairman to appoint such a committee. In a telephone conversation that night, Meyer urged Schade not to worry about the severance package, assuring him that Diethrich was committed to the plan to have the committee formulate a recommendation.

Schade next met with Meyer and Diethrich at St. Joseph's Hospital in Phoenix on the morning of November 17, 1982. Angered that Schade's resignation had not been forthcoming, Diethrich now threatened to fire him by five o'clock that day if he did not resign by four.

By late afternoon, Schade decided to resign and telephoned Meyer to report his decision. Once again Meyer assured him that he had no cause to worry about the separation agreement, "because we'll have a committee and they'll work out something we're sure will be fair and equitable." RT, Apr. 9, 1985, at 110. About 5:30 p.m. Schade hand-delivered a letter of resignation to Diethrich. In pertinent part the letter stated:

> Based on our recent discussions, I am offering my resignation at this time in reliance on your assurance that a separation agreement, to be subsequently worked out, will be equitable, fair, and commensurate with my 10 and a half years of tireless and devoted service to the building of the Arizona Heart Institute and the International Heart Foundation.

Exhibit 28.

In response to the letter, Diethrich expressed his regret that "it had to come to this." Schade had done a good job, Dieth-

---

2. As a nonprofit corporation, the Foundation is governed by a board of directors.

3. From July 1981 to March 1983, the Foundation paid sixty-two percent of Schade's salary, the Institute thirty-eight percent.

4. Meyer was the attorney for Diethrich, the Institute, and the Foundation, as well as a member of the Foundation's board of trustees and its secretary.

rich recalled, and had been loyal and supportive. Then Diethrich reiterated Meyer's assurances that Schade need not worry about severance pay. Diethrich had already spoken to the Foundation's board chairman and arranged for the appointment of a committee to formulate a recommendation for a separation agreement.

Shortly thereafter, Diethrich called Schade to address another troubling issue. The Foundation-sponsored International Cardiovascular Congress was three months away. This biennial program was Diethrich's major educational and public relations showcase, attracting speakers and guests from around the world. Schade had been concerned about abandoning his preparations for the event. Now Diethrich seemed to share Schade's concerns. Expressing his doubt that the Congress could succeed without Schade's efforts, Diethrich asked him to continue working on it.

After he returned home that night Schade received another telephone call from Diethrich. He had written Schade a letter, Diethrich explained, and he wanted to be able to read it to him in person. Schade returned to the Institute, where Diethrich jumped into Schade's car and asked Schade to drive him home. En route Diethrich read aloud his letter accepting Schade's resignation:

> It is with the deepest regret that I accept your resignation.... You have exhibited untireless [sic] energy and devotion over the past ten and a half years and there is no question in my mind that the success of the Institute, the Foundation and me personally are due in no small part to the energies you have exerted.

....

> Since you have been such an integral part of our program, I would like to make two requests. First, the upcoming International Cardiovascular Congress has been essentially a program which you have directed and nurtured since its inception. I would appreciate it very much if you would continue to coordinate that program for us and bring it to a successful completion....
>
> ... You can rest assured that I will develop an equitable and fair separation agreement for you.

Exhibit 27. Schade accepted Diethrich's offer of continued employment, relying on Diethrich's assurance of an equitable and fair separation agreement,[5] and proceeded with his work on the Congress.[6]

Within a week Diethrich formally requested the Foundation's board to develop a severance package for Schade. The minutes of the board meeting of November 22, 1982 reflect this request:

> Dr. Diethrich read a letter of resignation from Dewey Schade, resigning from his position as a member of the Board and as chief operating officer.... He emphasized that Mr. Schade had served both the Foundation and the Institute with great dedication for more than ten years. [The chairman] appointed a committee ... to meet with Mr. Schade for the purpose of formulating a recommendation of an equitable financial arrangement for his severance.

Exhibit 47.

The committee of Foundation members (Committee) proceeded to carry out its

---

5. His reliance is reflected in a letter from Schade to the Foundation's bookkeeper concerning an unrelated matter. Written on January 19, 1983, before the present dispute arose, the letter records Diethrich's request that Schade stay on to direct the preparation, staging, and follow-up for the 1983 Congress. "I agreed to Dr. Diethrich's request," Schade wrote, "... pending the finalization of a mutually satisfactory separation agreement." Exhibit 22. See also RT, Apr. 15, 1985, at 292–93, 336.

6. Diethrich and Schade apparently agreed that Schade was to remain a Foundation employee at his present salary through March 6, 1983.

See Exhibits 22 and 23. The committee appointed to formulate the separation agreement was apparently unaware of this arrangement, however. On its own initiative, the committee determined that Schade's original employment with the Foundation should be "considered concluded" as of January 1, 1983 and that he should receive fifty percent of his present Foundation salary during the ensuing period. Exhibit 12. After a series of communications among Schade, Diethrich, and Meyer, the matter was finally settled in April 1983, with Schade's receiving his full salary from the Institute and the Foundation through March 6, 1983.

charge. On December 14, 1982 it met, developed its recommendation for a separation agreement, and communicated that recommendation to Diethrich. Basing its recommendation on the fact that Schade had been employed by the Institute for nine years and by the Foundation for only one, the Committee proposed that

> ... Mr. Schade be given one year's salary as separation pay, with the Foundation paying for 25% of that cost and [the Institute] paying 75%.
>
> We also feel that Mr. Schade should be allowed to keep the leased automobile with covering insurance, his credit card and telephone ... during the year of 1983.
>
> As we understand it, Mr. Schade has been lax in taking his vacation over the years and consequently, we feel that his earned, but untaken, vacation for the past two years should be compensated for with the same percentages applied as stated above.

Exhibit 12.

The record does not establish when Schade first learned of the substance of the Committee's recommendation.[7] It does indicate, however, that he knew "within days" of December 14, 1982 that the Committee had made its recommendation. RT, Apr. 15, 1985, at 239–40. Schade continued his work on the Congress.

Between December 14, 1982 (when Diethrich received the Committee's report) and March 6, 1983 (when Schade concluded his work on the Congress), Diethrich did not communicate with Schade about the Committee's recommendation. Indeed, it was not until March 30, 1983 that Diethrich announced for the first time "the final terms of your separation agreement" with the Institute. Exhibit 1. In a letter to Schade, Diethrich prefaced his offer by noting that "your service and contribution to AHI Cardiovascular Surgeons and AHI Ltd. in both time and accomplishments were compromised severely many months prior to our November termination meet-

ing." Id. The letter then proposed that the Institute would pay "its [seventy-five percent] share of your full salary for six (6) months" from March 6, as well as the cost of Schade's "automobile lease, health and insurance program" for the same period. Id. Diethrich acknowledged at trial that the specifics of the letter proposal were his "own idea." RT, Aug. 16, 1985, at 379–80.

Schade's response to this communication was three-fold. In a letter dated April 11, 1983, he first strongly protested Diethrich's recent, negative characterization of his services to the Institute. He then rejected the terms of Diethrich's severance proposal. Finally, he indicated his willingness to accept the Committee's recommendation as "a fair-minded settlement proposal." Exhibit 15.

By the summer of 1983, the Foundation paid Schade its share of severance pay according to the Committee's recommendation. The Institute paid Schade nothing, while continuing to protest the amount the Committee had recommended. To resolve the impasse, Schade wrote to Diethrich on July 1, 1983 urging him to "reconsider the terms proposed in your March 30 letter in favor of the settlement worked out by the [Committee] last December." Exhibit 10.

Steve Mihaylo, a Foundation board member and a member of the committee appointed to develop Schade's severance package, also encouraged Diethrich to abide by the Committee's recommendations. In letters addressed to Diethrich and the Foundation's board chairman, Mihaylo expressed his concern that Schade had not received his severance pay from the Institute. Mihaylo urged that the Committee's recommendation was a "fair and equitable proposal." Exhibit 7. He stated, moreover, that "I know personally, and I feel the other committee members feel the same, that I wouldn't have spent my time on the committee unless I felt our separation terms were more than tokenism." Exhibit 9. Apparently in response to these communications, Diethrich announced a "fi-

---

7. He indicated on April 11, 1983 that he had "recently been informed of the committee's recommendations." Exhibit 15. He first *saw* the December 14, 1982 letter containing the Committee's recommendation on May 10, 1983. Exhibit 13.

nal and definitive offer" of $40,000 from the Institute. Exhibit 32.

Schade's response to this was legal action against Diethrich and AHI Cardiovascular Surgeons, Ltd. He charged breach of the termination contract and wrongful discharge, and included a claim for treble damages. Defendants counterclaimed for breach of the employment contract and of fiduciary duties. The case was tried to the court, which first granted the defendants' motion for judgment on the wrongful discharge count and plaintiff's motion to dismiss the counterclaim. On the contract claim, the trial court found that the parties had made an enforceable contract and partially performed it. For breach of that contract, the court found defendants liable for $73,500 in severance pay and $3,500 in other benefits. Finding no good faith dispute, the court awarded Schade treble damages pursuant to A.R.S. §§ 23–355 and –350(5). Diethrich appealed.

The court of appeals held that the parties' contract failed for indefiniteness. It nevertheless upheld the trial court's judgment on the basis of promissory estoppel. Because recovery based on promissory estoppel may be limited "as justice requires," Restatement (Second) of Contracts § 90 (1981) (hereafter Restatement), however, and because the appellate court found that a good faith dispute did exist, it reversed the award of treble damages. Diethrich petitioned for review, claiming the court of appeals erred in permitting any recovery. Schade cross-petitioned, arguing the court of appeals had improperly reversed the treble damage and interest awards.

DISCUSSION

A. Was Diethrich's Promise Enforceable?

1. *Trial Court's Holding*

The trial court's conclusion that Diethrich and Schade had entered into an enforceable contract was based on an amalgam of legal theories. The court found, first, a contract: Diethrich's promise of "fair and equitable severance benefits based on [Schade's] tireless service of 10½ years and his unique contributions" and the

appointment of "an unbiased committee … to make recommendations as to the amount of fair and equitable severance benefits"— all in return for Schade's resignation and his continuing coordination of the 1983 International Cardiovascular Congress. The court then found that Schade had performed under this contract and concluded that Diethrich's silence with respect to the Committee's recommendation constituted acceptance of the recommendation and/or waiver of the right to object. Findings of Fact, Conclusions of Law and Judgment, Instruments of Record on Appeal, at 108.

2. *Court of Appeals' Holding*

In contrast, the court of appeals focused almost exclusively on Diethrich's promise to develop a fair and equitable severance agreement for Schade. It found that promise too indefinite on its face to support a contract. Because the parties had not agreed to be bound by the Committee's determination of fair and equitable severance benefits, the court refused to consider its recommendation as a means of making the promise definite. There being no other extrinsic standard to define "fair and equitable severance benefits," the court found the agreement too vague to enforce. Even if it could supply the missing terms, the court declined to do so because the parties evidenced no intent to be bound by their agreement. Slip op. at 12.

Despite these problems, the court of appeals found Diethrich's promise sufficiently definite for Schade to have relied upon it and enforced the promise on the theory of promissory estoppel. In reaching this conclusion, the court relied on *Hoffman v. Red Owl Stores*, 26 Wis.2d 683, 133 N.W.2d 267 (1965), and held that to the extent necessary to avoid injustice, the court could enforce a promise normally so indefinite as to be nonbinding. In *Hoffman*, the Wisconsin Supreme Court extended promissory estoppel beyond its traditional application as a substitute for consideration. *See also School District No. 69 v. Altherr*, 10 Ariz. App. 333, 339, 458 P.2d 537, 543 (1969). Looking to the Restatement's definition of promissory estoppel, it found that section

90 "does not impose the requirement that the promise giving rise to the cause of action must be so comprehensive in scope as to meet the requirements of an offer that would ripen into a contract if accepted." *Hoffman,* 26 Wis.2d at 698, 133 N.W. 2d at 275.

Thus, finding that the Committee's recommendation was fair and equitable, the court concluded that Diethrich must pay Schade damages equal to the severance package recommended by the Committee.

### 3. *The Arizona Authority*

The court of appeals compared the promise here to the indefinite promises in *Pyeatte v. Pyeatte,* 135 Ariz. 346, 661 P.2d 196 (App.1982), and *Edwards v. Hauff,* 140 Ariz. 373, 682 P.2d 1 (App.1984). Finding Diethrich's promise equally indefinite, the court felt compelled to declare it unenforceable. We, however, find *Pyeatte* and *Edwards* distinguishable.

*Pyeatte* involved an agreement between a husband and wife that she would put him through law school in return for his later supporting her through a master's program. After the wife completed her performance, the husband decided he wanted a divorce and refused to honor his promise. Because there were no provisions in the agreement for the cost of the wife's education, the time the husband's performance was to commence or last, or the location where it was to take place, the court of appeals found a lack of the mutual understanding necessary to fix the husband's liability with certainty. 135 Ariz. at 350, 661 P.2d at 200. In contrast, Diethrich's promise lacked only the price term. *See* Restatement § 33 comment c ("The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement."). Diethrich and Schade understood their respective duties pursuant to the agreement.

*Edwards* involved a claim that the defendant, Hauff, had appropriated an investment opportunity to himself in violation of his fiduciary duty to his principal, the plaintiff. Hauff counterclaimed that the plaintiff had earlier violated an oral agreement

that neither would purchase an interest in property without first giving the other an opportunity to participate. The written contract contained no mention of such an agreement and the only evidence that it had been reached was Hauff's testimony that such was his "understanding." The court of appeals upheld the trial court's dismissal of the counterclaim, reasoning that it could have been justified by the lack of evidence showing any agreement at all or by the alleged agreement's indefiniteness as to each party's share of participation. The Schade–Diethrich agreement stands in sharp contrast to this alleged, unilateral "understanding." Both parties in our case acknowledged the existence of the agreement and found its terms definite enough to begin performing immediately.

We accordingly do not share the court of appeals' belief that Arizona caselaw has recognized the principle that promises such as Diethrich's are "too vague to form the basis of a contract." Slip op. at 9. Indeed, such a holding would be contrary to established authority.

### 4. *The Making of the Contract—A Bargained-for Consideration*

■ Although we do not reject the *Hoffman* doctrine, we disagree with the court of appeals' application of Restatement § 90 in this case. We note that even the Wisconsin Supreme Court has refused to expand § 90 in the direction the court of appeals has suggested. *See Rossow Oil Co., Inc. v. Heiman,* 72 Wis.2d 696, 242 N.W.2d 176 (1976). Moreover, we decline to retry the factual issues that were resolved in Schade's favor at trial. This court will not set aside the trial court's findings of fact unless they are clearly erroneous. *See* Rule 52(a), Ariz.R.Civ.P., 16 A.R.S.; *State ex rel. LaSota v. Arizona Licensed Beverage Association,* 128 Ariz. 515, 627 P.2d 666 (1981).

The trial court found that
[T]here were a number of oral conversations among Schade, Diethrich and Diethrich's attorney and agent Paul Meyer culminating in an offer made to Schade by Diethrich that if Schade would resign

his employment with both Defendants and the International Heart Foundation effective immediately, Schade would receive fair and equitable severance benefits based on his tireless service of 10½ years and his unique contributions, that an unbiased committee would be appointed to make recommendations as to the amount of fair and equitable severance benefits and Schade would continue to work toward presenting the International Cardiovascular Congress IV.

Finding of Fact No. 8.

Schade accepted the Defendants' offer and resigned his employment with both Defendants and the [Institute], upon the terms agreed upon with Diethrich.

Finding of Fact No. 9. The record facts support the trial court's finding that there was a valid offer and a valid acceptance. *See* Restatement § 22 ("the formation of a contract requires a bargain in which there is a manifestation of mutual assent and a consideration").

■ We turn then to the question of consideration to support the bargain. To constitute consideration, a performance or a return promise must be bargained for. Restatement § 71(1). *See also Carroll v. Lee*, 148 Ariz. 10, 712 P.2d 923 (1986). A performance or return promise is bargained for if sought or given in exchange for the promise of the other party. Restatement § 71(2). Monetary gain is not always required as consideration. *Carroll.*

■ The facts clearly show that Diethrich made his promise of a fair and equitable severance agreement to Schade with the expectation that Schade would fulfill his promise to resign and to continue work on the Congress. Schade's promises were consideration to Diethrich for two reasons. First, Schade's resignation enabled Diethrich to avoid the bitter debate that might have ensued with Schade's supporters on the Foundation's board over the sudden firing of an outstanding employee. Second, Schade's promise to continue work helped ensure the success of the Congress, one of Diethrich's projects. According to Schade, Diethrich's promises of severance pay were what induced him to submit his resignation and then continue working.[8] Thus, Schade and Diethrich each bargained for and supplied the requisite consideration. *See Hirsch v. Associated Amusement Machine Operators*, 205 Misc. 105, 127 N.Y.S.2d 82 (1953) (submission of employee's resignation sufficient consideration for the promise to pay severance benefits); *Twohy v. Harris*, 194 Va. 69, 72 S.E.2d 329 (1952) (employee's promise to remain in employ of defendant employer valid consideration for the promise to pay severance benefits).

■ We thus find in the Diethrich–Schade agreement two of the requisites of making a contract—a bargain, consisting of promises exchanged, and consideration. Diethrich argued and the court of appeals agreed, however, that the agreement was nevertheless unenforceable for lack of certainty. The parties agree that the details of a fair and equitable severance package were unresolved when they concluded their agreement on the night of November 17,

---

**8.** We find it unnecessary to consider the traditional concept of "legal detriment" in this case. At least one learned commentator has recommended that courts abandon its use because the term has not afforded adequate guidance in distinguishing sufficient from insufficient consideration. 1 A. CORBIN, CORBIN ON CONTRACTS § 123 (1963). Neither the Restatement of Contracts nor the Restatement (Second) of Contracts mentions benefit or detriment in its definition of consideration. Once there has been a bargained-for exchange, Restatement (Second) explicitly states there is no further requirement of "a ... benefit to the promisor or a ... detriment to the promisee." Restatement § 79. Thus, "to the extent that the theory eliminated any requirement of benefit or detriment, it made some promises enforceable that might previously have been unenforceable ... by shifting the concern of judges away from the substance of the exchange ... [to] the process by which the parties had arrived at that exchange." E. FARNSWORTH, CONTRACTS § 2.2 (1982). We believe such a shift in emphasis is proper. Decisions on the making, meaning and enforcement of contracts should hinge on the manifest intent of the parties rather than on a judge's view of what is proper, or on rhetorical constructs finding a meeting of the minds where none occurred or disregarding one which actually happened. *See Darner Motor Sales v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 682 P.2d 388 (1984); *Smith v. Melson*, 135 Ariz. 119, 659 P.2d 1264 (1983).

1982. However, this was the only provision of a multi-term agreement that was uncertain and left for later resolution. We believe that the requirement of certainty is not so much a contractual validator as a factor relevant to determining the ultimate element of contract formation—the question whether the parties manifested assent or intent to be bound.

### 5. The Making of the Contract—Certainty and Manifestation of Assent

The requirement of reasonable certainty of terms arises from the inescapable fact that the uncertainty of the promises may indicate that a proposal or acceptance was not intended to be understood as a binding offer or acceptance. Restatement § 33(3). It follows that reasonable certainty is important as a factor in determining whether the parties intended to make a binding offer and acceptance. *Id.* Thus, with regard to Diethrich's assertion that his arrangement with Schade was merely an agreement to agree, evidencing no intent to be bound, we turn again to the Restatement:

The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement § 33(3).

... But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. *In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.*

*Id.* comment a (emphasis added).

The Restatement attempts to report settled principles of law. Section 33 is no exception. Its description of the operative facts sufficient to create a contract were enunciated by the United States Supreme Court as early as 1891. *Joy v. City of St. Louis*, 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843 (1891), involved a contract under which a railroad company claimed the right to use a certain portion of tracks constructed by another—the "Wabash" company. The first company based its claim upon a contract which provided in part that the Wabash company

shall permit, under such reasonable regulations and terms as may be agreed upon, other railroads to use its right of way through the park, ... upon such terms, and for such *fair and equitable compensation* to be paid to it therefor, *as may be agreed upon* by such companies.

*Id.* at 5–6, 11 S.Ct. at 246 (emphasis added).

The Wabash company's successors challenged a federal circuit court's decree upholding the enforceability of this provision. Like Diethrich, the company claimed that the agreement was an "agreement to agree"—not sufficiently definite to be enforced by a court of equity. *Id.* at 29, 11 S.Ct. at 250. Soundly rejecting this argument, the Supreme Court stated:

Paragraph 9 [the provision at issue] is imperative. It provides that the [Wabash Company] "shall permit" other railroads to use its right of way. This is to be done "under such reasonable regulations and terms as may be agreed upon," and "upon such terms and for such fair and equitable compensation ... as may be agreed upon by such companies." Not only are the regulations and terms to be reasonable, but the compensation is to be fair and equitable. Although the statement is that the compensation is to be such "as may be agreed upon by such companies," yet the statement that it is to be "fair and equitable" plainly brings in the element of its determination by a court of equity. If the parties agree upon it, very well; but if they do not, still the right of way is to be enjoyed upon making compensation, and the only way to ascertain what is a "fair and equitable" compensation therefor is to determine it by a court of equity. Such is, in substance, the agreement of the parties. The provision cannot be construed as meaning that, if the parties do not agree, there is to be no compensation, and that, because there can in that event be no compensation, there is to be no enjoyment of the right of way. In

this view, it cannot be said that the court is making an agreement for the parties which they did not make themselves. *Id.* at 43, 11 S.Ct. at 255 (citations omitted). *See also Henderson Bridge Co. v. McGrath*, 134 U.S. 260, 275–76, 10 S.Ct. 730, 735, 33 L.Ed. 934 (1890) (holding a promise to do "what was right" enforceable so long as it was made with contractual intent); *Brennan v. Employers' Liability Assurance Corp.*, 213 Mass. 365, 367, 100 N.E. 633, 634 (1913) (holding that a promise to "make it right" did not fail for indefiniteness since "[j]uries are constantly solving such problems"); *Noble v. Joseph Burnett Co.*, 208 Mass. 75, 82, 94 N.E. 289, 289–90 (1911) (upholding the enforceability of a promise to pay "a fair and equitable share of the net profits" as neither so indefinite nor so impracticable that it cannot be applied with reasonable certainty); 1 A. CORBIN, CORBIN ON CONTRACTS § 95, at 400 (1963) ("If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a just and fair result, even though this requires ... the filling of some gaps that the parties have left"); Restatement § 33 comment e (where the parties intend to conclude a contract for the rendition of services and the price is left to be agreed by the parties and they fail to agree, the price is a reasonable price). *But see, e.g., Varney v. Ditmars*, 217 N.Y. 223, 111 N.E. 822 (1916) (holding a promise to pay a "fair share of my profits" too vague to furnish a right of action, a result from which Justice Cardozo dissented).

■ We find Diethrich's promise in the present action no less definite than the Wabash Company's promise in *Joy*. The record strongly supports the trial court's finding (Finding of Fact No. 10) that Diethrich's offer and Schade's acceptance were made with contractual intent. "The fact that one of [the parties], *with the knowledge and approval of the other*, has begun performance is nearly always evidence that they regard the contract as consummated

and intend to be bound thereby." 1 A. CORBIN, *supra* § 95, at 407 (emphasis added). *See also* Restatement § 34(2) (part performance under an agreement may establish that a contract enforceable as a bargain has been formed). If part performance can furnish evidence of intent to make a contract, then rendition and acceptance of a party's full performance must be an even more compelling basis to enforce that agreement.

In this case, both Schade and Diethrich began performing within days of making the contract. Having accepted Diethrich's offer by resigning his former position on November 17, 1982, Schade undertook his newly defined duties for the Congress the next day. According to the terms of his agreement with Diethrich, he continued to perform these duties in support of the Congress through March 6, 1983. Diethrich, for his part, attended the Foundation's board meeting on December 22, 1982 to personally request the appointment of the committee that would formulate Schade's severance package. By these acts the parties clearly manifested their joint understanding that they were bound by their promises. In view of this, it cannot be said that the trial court made an agreement for the parties which they did not make themselves. *See Joy*, 138 U.S. at 43, 11 S.Ct. at 255; *cf. Pyeatte* and *Edwards*, where the facts of each case created doubt as to the parties' intent to be bound.[9]

■ Any requirement of "reasonable certainty" is satisfied if the agreement that was made simply provides "a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement § 33(2). Unlike *Joy*, moreover, in the case before us the trial court did not need to take upon itself the task of filling the gaps in the parties' agreement and designing an appropriate remedy. It had, instead, the opinion of experts mutually selected by Diethrich and Schade. The Committee to which they turned to recommend a fair and equitable severance agree-

---

9. The more uncertainties in the terms of the contract, "the stronger the indication" that the parties do not intend to be bound; even where they do, if numerous terms are uncertain the "uncertainty may be so great as to frustrate their intention." Restatement § 33 comment f.

ment was composed of businessmen familiar with personnel practices involving senior executives. Assuming they acted in good faith, Diethrich and Schade impliedly agreed to accept the Committee's recommendation *if* they found it fair and equitable. Here, as in *Joy*, if the parties could agree upon what was "fair and equitable," then "very well; but if they [did] not," then the Committee's recommendation might be agreed upon, but if not, then what was to be "fair and equitable compensation ... [would be] determine[d] ... by a court of equity." The parties did not agree upon fair and equitable severance compensation, nor did they agree upon the Committee's recommendation. The trial court found, however, that that recommendation was "fair and equitable" and adopted it. Finding of Fact No. 15. The trial court's finding was supported by credible evidence, and we, in turn, are bound by the trial court's finding. *See* Rule 52(a), Ariz.R. Civ.P., 16 A.R.S.; *State ex rel. LaSota v. Arizona Licensed Beverage Assn*, 128 Ariz. 515, 627 P.2d 666 (1981); *Bevins v. Dickson Electronics Corp.*, 16 Ariz.App. 105, 107, 491 P.2d 494, 496 (1971).

We hold that Diethrich and Schade made a bargain for a consideration, that the record supports the trial court's finding that the parties intended to be bound and manifested that intention. We hold, further, that the contract thus formed was capable of enforcement. We affirm that portion of the judgment which awarded Schade damages of $73,500 as the Institute's unpaid portion of severance pay, and $3,500 as other severance benefits.

## B. Was Schade Entitled to Treble Damages Under A.R.S. § 23–355?

The trial court found that the sums owed by Diethrich were "wages" within the meaning of A.R.S. § 23–355. Finding further that there was no good faith dispute as to the amounts owed, the trial judge awarded treble damages as required by the statute. The court of appeals reversed, articulating three reasons. The first was that the sums owed by Diethrich were not "wages" within the meaning of the statute. Next, the court concluded that there was a

reasonable, good faith dispute between Diethrich and Schade. Finally, the court held that because recovery was "predicated solely on § 90 of the Restatement"—a form of promissory estoppel—the remedy allowed might be "limited as justice requires." Slip op. at 33.

Part of our reluctance to expand the applicability of Restatement § 90 to cases other than those in which promissory estoppel forms a substitute for consideration, thus permitting enforcement of noncontractual promises, is that the theory provides little in the way of legal rules for allowing or limiting recovery. The concept of doing what "justice requires" varies from case to case and from the perception of one judge to that of another. While this is both desirable and unavoidable in considering facts, it is hardly a sound method for constructing legal standards generally applicable to the facts once they are determined. In any event, having held that the parties made an enforceable contract, we are not free to grant or withhold remedies limited only "as justice requires." The remedy of treble damages is available; it may be provided to Schade if his case fits the statute and must be denied if it does not. We turn then to consider whether the sum owed by Diethrich was "wages" within the meaning of the statute.

### 1. Did Diethrich Fail to Pay "Wages"?

A.R.S. § 23–355 provides that when an employer fails to pay "wages due any employee" the employee is entitled to recover an amount which is "treble the amount of the unpaid wages." The term "wages" is defined in A.R.S. § 23–350(5) as follows:

"Wages" means nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation. *Wages include* sick pay, vacation pay, *severance pay*, commissions, bonuses and other amounts promised when the

employer has a policy or a practice of making such payments.

(Emphasis added.)

Noting the "ambiguous nature" of the statute, slip op. at 33, the court of appeals resorted to the "doctrine of the last antecedent," holding that the qualifying words —"when the employer has a policy or a practice of making such payments"—applied not only to "other amounts promised" but to "severance pay." The severance pay which Diethrich had expressly promised to pay Schade was not "wages" because Diethrich had neither "a policy [n]or a practice of making such payments."

We disagree with this conclusion for several reasons. The statute is ambiguous: the qualifying phrase at the end of the second sentence may modify only the employer's liability for "other amounts promised" or the entire enumeration of benefits included in the second sentence, including severance pay. Under the doctrine of last antecedent, however, the modifying phrase would ordinarily apply only to the phrase which directly precedes it and not to words further removed. *Tanner Companies v. Arizona State Land Department*, 142 Ariz. 183, 189, 688 P.2d 1075, 1081 (App. 1984). Thus, the limiting condition of "policy or practice" should apply only to "amounts promised" and not to sick pay, vacation pay, severance pay, commissions and bonuses. *Tanner Companies* indicated, however, that where, as in the statute before us, the limiting phrase is connected to prior words by a term such as "other," the limiting phrase may be connected to the prior words. But this is an exception to the rule and need not be applied. *Id.; see also Federal Trade Commission v. Mandel Brothers, Inc.*, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); *Town of Florence v. Webb*, 40 Ariz. 60, 9 P.2d 413 (1932). The cardinal rule of statutory interpretation is to determine and give effect to the legislative objectives. *Calvert v. Farmers Insurance Co.*, 144 Ariz. 291, 697 P.2d 684 (1985); *Mandel; Tanner Companies; Webb*. By applying the exception to the rule of the last antecedent, the court of appeals did just the opposite. If the limitation requiring a "policy or a practice" is applied to each type of payment enumerated in the second sentence of A.R.S. § 23–355, then employers of only one employee or those with a unique employee will be exempted from the application of the statute merely because they have no other employees in the same category as the one to whom the promise was made.

The purpose of A.R.S. § 23–350 is to define the terms used in the sections that follow. Listing various forms of compensation—sick pay, vacation pay, severance pay, etc.—furthers this goal. In order to make the definition complete, the legislature added the phrase "and other amounts promised when the employer has a policy or a practice of making such payments."

We believe that a restrictive interpretation of the statute would frustrate important legislative objectives. The treble damage statute deters employers from withholding or delaying payment of sums which employees have earned, *Apache East, Inc. v. Wiegand*, 119 Ariz. 308, 312, 580 P.2d 769, 773 (App.1978), and protects employees from an employer's groundless refusal to pay compensation which was promised and which was due "in return for work performed." *Nieto–Santos v. Fletcher Farms*, 743 F.2d 638, 642 (9th Cir.1984) (statute is inapplicable, therefore, to damages for breach of a contract to employ). The legislature surely did not intend to permit an employer to procure labor or services by a specific promise of compensation and then evade financial responsibility merely because he only had a single employee, made the promise to a unique employee, or made a unique promise to one of many employees.

In this case, Diethrich made the promise of a separation "package" in part for Schade's services. More important to the present inquiry, the promise was made to induce Schade to perform services for the upcoming Congress. Schade provided those services and testified that he would not have done so without Diethrich's promise. While the amount was subject to computation, the obligation to pay was abso-

lute, not discretionary. By its terms, the statute subjects an employer to treble damages for failing to pay nondiscretionary compensation for labor or services actually performed and for which the employee had a reasonable expectation, no matter how the compensation is calculated or whether labeled as wages, sick pay, vacation pay, severance pay, commissions or bonuses. *See Abrams v. Horizon Corp.*, 137 Ariz. 73, 77, 669 P.2d 51, 55 (1983). The requirement of a policy or practice of making such payments is applicable only to the nonenumerated types of benefits—"other amounts promised"—which might not ordinarily qualify as compensation for services rendered.[10]

In the case before us, Diethrich's commitment made the severance compensation nondiscretionary. It was for services rendered before the promise and for services actually rendered after the promise. Schade had a reasonable expectation that he would be so compensated because Diethrich had made a specific promise and had allowed Schade to perform on that expectation. The trial court properly applied A.R.S. § 23–355.

### 2. *Good Faith Dispute*

■ If an employer withholds wages because of a "good faith dispute," the court should not award treble damages. A.R.S. § 23–352; *see also Abrams*. The trial court's findings and conclusions on the good faith issue are both contained in paragraph No. 9 of its Conclusions of Law. Portions of that paragraph are actually findings of fact rather than conclusions of law. Insofar as findings of fact are erroneously included in a paragraph labeled as a conclusion of law, we review them by the standard applied to factual findings. *See* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2588 (1971).

■ Between the time the Committee announced its recommendation and the time Schade completed work on the Congress

some three months later, Diethrich never complained that the Committee's recommended benefits were anything but fair and equitable for an employee of Schade's "dedication" and ten years of "untireless energy and devotion." *See* Exhibit 27. Indeed, to this day Diethrich has *never* challenged the specifics of the Committee's recommendation. It would be difficult for Diethrich to argue that the recommendation was unfair or unreasonable. The idea of presenting the matter to a committee, and this particular committee, originated from Diethrich or his lawyer, not from Schade. The Committee was made up of businessmen who were both familiar with the quality of Schade's performance and experts in the very area in question. These businessmen were colleagues of Diethrich's at the Foundation and served with him on its board. He is hardly in a position to attack their competence, fairness or integrity.

Of course, despite all this, the Committee could simply have erred or used bad judgment in one manner or another. Diethrich has never specifically suggested that such is the case to the Committee, to his colleagues on the board, to the Foundation, to the trial judge, to the court of appeals or to this court. It was only after Diethrich had obtained the benefit of Schade's work that he announced that the Committee's recommendations for Schade were unreasonably high.

Thus, we find that the evidence supports the trial judge's conclusion regarding the absence of a good faith dispute. As the trial judge pointed out, although Diethrich was aware of the Committee's recommendations from almost the very beginning of Schade's performance of the contract, he failed to reveal them to Schade and made no mention of any disagreement with those recommendations until after he allowed Schade to finish performance. Finally, at no time has Diethrich ever advanced any specific ground for his disagreement with the Committee nor explained why its rec-

---

**10.** For instance, the Committee also recommended that Schade receive insurance, automo-

bile, telephone and credit card benefits.

ommendations were unreasonable. The trial judge could and evidently did find (*see* Conclusion No. 9) that Diethrich allowed Schade to perform the contract, while intending to exert pressure at the end to force him to accept less than he was entitled. We believe that the treble damages statute was enacted to discourage just such practices.

We therefore conclude that the trial court did not abuse the discretion given him by the statute in holding Diethrich liable for treble the amount of the unpaid severance benefits. *See Apache East*, 119 Ariz. at 313, 580 P.2d at 774.

## C. Was Schade Entitled to Prejudgment Interest on the Unpaid Severance Benefits and, if so, From What Date?

The trial court awarded Schade prejudgment interest from March 6, 1983, the date on which he completed work on the Congress. The court of appeals disagreed. Because it enforced Diethrich's promise on the basis of promissory estoppel, it emphasized the discretionary nature of its judgment and held that Schade's claim was unliquidated until that judgment was entered. We disagree.

In Arizona a party's entitlement to prejudgment interest generally depends on whether his or her claim is "liquidated." *Arizona Title Insurance & Trust Co. v. O'Malley Lumber Co.*, 14 Ariz.App. 486, 496, 484 P.2d 639, 649 (1971). " 'A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion.' " *Id.*, quoting C. McCORMICK, DAMAGES § 54 (1935). If a claim is found to be liquidated, then prejudgment interest is a matter of right. *Fleming v. Pima County*, 141 Ariz. 149, 155, 685 P.2d 1301, 1307 (1984).

Schade maintains that his claim was liquidated when the Committee issued its recommendation on December 14, 1982. Diethrich argues that the Committee's action could have had no such result because it involved the exercise of opinion and discretion. A similar dispute confronted this

court in *La Paz County v. Yuma County*, 153 Ariz. 162, 735 P.2d 772 (1987).

In that case, La Paz County claimed prejudgment interest on assets awarded to it from Yuma County following the former's creation out of the latter, like Eve from Adam's rib. *Genesis* 2:21–22 (King James). Before the dispute arose, Yuma had filed an accounting showing it owed La Paz $433,427.55, an amount based on the property valuations of Yuma's own appraiser. Once the dispute arose, however, Yuma retained another appraiser and offered his lower appraisals as the basis for dividing the county's assets. The special master appointed by this court determined that La Paz was entitled to the $433,427.55. In adopting the special master's report to this effect, we wrote:

> We find that the sum of $433,427.55 Yuma conceded was due La Paz is a liquidated amount. The values for the property were determined by Yuma's own appraiser, and were adopted by the special master.... [T]his sum was computed with exactness, and therefore prejudgment interest on this amount is appropriate.

*La Paz County*, 153 Ariz. at 168, 735 P.2d at 778.

We similarly find, in the case at bar, that the value of a fair and equitable severance package was determined by Diethrich's own "appraiser," the Foundation-appointed Committee. The recommendation of this group of businessmen, expert in executive compensation plans, involved no greater degree of opinion or discretion than did the valuations of Yuma County's appraiser. Just as the appraiser's valuations were adopted by the special master in *La Paz*, the Committee's recommendation was adopted by the trial court below.

Following *La Paz*, we hold that Schade's claim was liquidated on December 14, 1982, when the Committee issued its recommendation. However, Schade did not complete the work he had contracted to perform until March 6, 1983. It was not until then that the sum promised became due. Therefore, we agree with the trial court that prejudgment interest did not ac-

crue until that date. Of course, prejudgment interest is calculated only on the actual severance pay, not on the penalty amount.

### D. Was Schade Entitled to Attorney's Fees?

█ A.R.S. § 12–341.01 provides that in an action arising out of a contract the court may award the successful party attorney's fees. "Who is the 'successful party' is never certain until the appeal process is concluded." *Wenk v. Horizon Moving & Storage Co.*, 131 Ariz. 131, 133, 639 P.2d 321, 323 (1982).

We uphold Schade's claims and find that the trial court's and court of appeals' award of attorney's fees was entirely proper. We also allow Schade attorney's fees for his appeal to this court. *See* Rules 21(a) and 21(c), Ariz.R.Civ.App.P., 17A A.R.S.

### CONCLUSION

We affirm the trial court's holding that Diethrich's promise was enforceable on the basis of an express contract, and that Schade was entitled to treble damages, prejudgment interest, and attorney's fees. We affirm the judgment against Diethrich and AHI Cardiovascular Surgeons, Ltd. We approve that portion of the court of appeals' opinion awarding Schade attorney's fees and vacate the balance of that opinion.

GORDON, C.J., and CAMERON, HOLOHAN and MOELLER, JJ., concur.