IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | |
|---|---|
| THOMAS R. ALTHAUS, TARA ALTHAUS, husband and wife; DUFFIELD, MILLER, YOUNG, ADAMSON & ALFRED, P.C., an Arizona professional corporation, lately known as DUFFIELD, YOUNG, ADAMSON & ALFRED, P.C., <br><br> Petitioners, <br><br> v. <br><br> HON. CARMINE CORNELIO, Judge of the Superior Court of the State of Arizona, in and for the County of Pima, <br><br> Respondent, <br><br> and <br><br> PENN-AMERICA INSURANCE COMPANY, a wholly owned company of PENN-AMERICA GROUP, INC., a Pennsylvania corporation, <br><br> Real Party in Interest. | 2 CA-SA 2002-0107 <br> DEPARTMENT B <br><br> O P I N I O N |

SPECIAL ACTION PROCEEDING

Pima County Cause No. C20012600

Humphrey Law Firm, P.C.
  By Marshall Humphrey III and Andrew J. Petersen                     Tucson
                                                    Attorneys for Petitioners


Turley, Swan & Childers, P.C.
  By Kent E. Turley                                               Phoenix
                                      Attorneys for Real Party in Interest

P E L A N D E R, Judge.

¶1　　　　This petition for special action arises from an attorney malpractice action filed by real party in interest Penn-America Insurance Company against petitioners (collectively, Althaus). Althaus previously represented Penn-America's insured, Pena Blanca Lake Resort, Inc., in a wrongful death action brought by Peter and Rita Wolfe for the death of their minor son.

¶2　　　　In this petition for special action, Althaus contends the respondent judge erred in two respects:  (1) in denying Althaus's motion for summary judgment, in which Althaus had contended the attorney malpractice action was time barred, and (2) in granting Penn-America's cross-motion for summary judgment, thereby striking Althaus's statute of limitations defense, particularly, without permitting Althaus to depose, as he had requested, various persons who had been involved in the wrongful death action or whose affidavits Penn-America had submitted in support of its cross-motion.

¶3　　　　The respondent judge's order is not appealable, and Althaus has no equally plain, speedy, and adequate remedy by appeal.  *See* Ariz. R. P. Special Actions 1, 17B A.R.S.  In addition, the issues raised involve mixed questions of fact and law that appear to be of first impression in Arizona, and addressing them now will serve the interests of judicial economy.  *See Montano v. Browning*, 202 Ariz. 544, ¶2, 48 P.3d 494, ¶2 (App. 2002); *Harris Trust Bank v. Superior Court*, 188 Ariz. 159, 162, 933 P.2d 1227, 1230 (App. 1996).  Therefore, we accept jurisdiction of the special action.

¶4　　　　On the merits, we conclude that the respondent judge did not abuse his discretion or otherwise err in denying Althaus's motion for summary judgment, at least at this juncture.  *See* Ariz. R. P. Special Actions 3(c).  But we further conclude that the respondent judge did abuse his

discretion in granting Penn-America's cross-motion for summary judgment and striking Althaus's limitations defense. *See Files v. Bernal*, 200 Ariz. 64, ¶2, 22 P.3d 57, ¶2 (App. 2001) ("[A] court abuses its discretion where the record fails to provide substantial support for its decision or the court commits an error of law in reaching the decision."). Genuine issues of material fact preclude that ruling, and Althaus's request for further discovery bearing on the limitations issue is warranted. *See* Ariz. R. Civ. P. 56(f), 16 A.R.S., Pt. 2. Although future discovery may affect final disposition of the limitations defense, neither the record nor applicable law supports a finding as a matter of law that Penn-America timely filed its malpractice action. Accordingly, we grant relief by vacating that portion of the respondent judge's order of June 19, 2002, that granted Penn-America's cross-motion and struck Althaus's defense.

## BACKGROUND

¶5        With respect to Penn-America's cross-motion, we view the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, here, Althaus. *See Walk v. Ring*, 202 Ariz. 310, ¶3, 44 P.3d 990, ¶3 (2002). So viewed, the record reflects that, on June 3, 1999, counsel for the Wolfes and several newly retained attorneys for Penn-America met and reached a settlement of approximately $2.6 million in the wrongful death action. That case previously had been tried to a jury, which had returned a net verdict of approximately $6.5 million in favor of the Wolfes and against Pena Blanca on May 13, 1999. As of June 3, however, the verdict had not yet been reduced to judgment. On June 4, counsel in the wrongful death action informed the trial court in that case that "the parties ha[d] reached a stipulation as to settlement

3

terms" and would be "filing the Stipulation with the Court after approval by the Bankruptcy Court" in which Pena Blanca was seeking a debtor's discharge.[1]

¶6 A handwritten note from the June 3 meeting, signed by the Wolfe attorneys, stated that the settlement was "[s]ubject to confidentiality agreement" and "approval of bankruptcy court." Similarly, a June 7 memorandum by Penn-America's Pennsylvania counsel stated that, on June 3, "we settled the case for an agreed $1.3 million for each plaintiff" and that "[t]he settlement is contingent upon approval by the bankruptcy court and extinguishment of all claims, both contractual and extra-contractual." A June 7 Penn-America internal memorandum authored by the company's senior vice president for claims stated that, after ten hours of negotiations on June 3, he "was able to settle this case," deemed it "an excellent result," and noted that "[w]e will secure all necessary releases prior to the distribution of any monies." Finally, Penn-America acknowledged in its statement of facts below that "the conditional settlement was reached, rather than litigate and file post-trial motions, because in balance, it made the most sense to Penn-America, and so was done."

¶7 Following the June 3 settlement meeting, counsel for the Wolfes and Penn-America negotiated, drafted, and ultimately agreed on a settlement agreement and release, which the Wolfes and their attorneys executed on June 11. As did the June 3 handwritten note, the settlement agreement stated that it was subject to and contingent on the approval and final order of the bankruptcy court in Pena Blanca's Chapter 7 bankruptcy proceeding. The agreement also was subject to and contingent on the release of Penn-America from any bad faith claims by the debtor, Pena Blanca, and its trustee in bankruptcy.

---

[1]Counsel for the bankruptcy trustee also attended the June 3 settlement meeting, and Penn-America reached an agreement with him as well.

4

**¶8**        The bankruptcy court approved the settlement by order on July 9, 1999.  On August 20, the underlying wrongful death action against Pena Blanca was dismissed with prejudice.  Penn-America filed its malpractice action against Althaus on June 7, 2001.  Thus, that action was timely filed unless it accrued before June 7, 1999.  *See* A.R.S. § 12-542.

## DISCUSSION

**¶9**        The respondent judge found, and the record could support such a finding, that "Penn-America knew or should have known of Mr. Althaus' claimed malpractice on or before June 3, 1999."  But the respondent judge then ruled that, "as a matter of law, . . . an enforceable Settlement Agreement, without contingencies, did not occur until June 11, 1999, at the earliest," and, therefore, "the current [malpractice] claim did not begin to accrue until that date."  The ruling was based on the so-called final judgment accrual rule of *Amfac Distribution Corp. v. Miller*, 138 Ariz. 155, 673 P.2d 795 (App. 1983) (*Amfac I*), which our supreme court later approved.  *Amfac Distribution Corp. v. Miller*, 138 Ariz. 152, 673 P.2d 792 (1983) (*Amfac II*); *see also Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 174, 179, 913 P.2d 1092, 1097 (1996); *Glaze v. Larsen*, ___ Ariz. ___, 55 P.3d 93 (App. 2002).  Althaus contends that rule "should have no application after a settlement or where there is evidence that the plaintiff has waived the right to appeal."  We generally agree with that premise, but its application here is complicated by the settlement conditions in the Wolfes' wrongful death case and Pena Blanca's bankruptcy proceeding.

**¶10**        In *Amfac II*, our supreme court approved the court of appeals' holding in *Amfac I* that "a cause of action for legal malpractice occurring in the course of litigation accrues when the plaintiff knew or should reasonably have known of the malpractice and when the plaintiff's damages are certain and not contingent upon the outcome of an appeal."  138 Ariz. at 156, 673

5

P.2d at 796, *approved*, *Amfac II*, 138 Ariz. at 153, 673 P.2d at 793. On its face, that holding does not apply here because Penn-America's damages, unlike Amfac's damage claims against its attorney, were "not contingent upon the outcome of an appeal." *Id*. Rather, by settling the underlying wrongful death action, Penn-America avoided the entry of judgment in that action and obviated the need for any appeal. Moreover, as noted below, on this record, a trier of fact could find that Penn-America's damages were "certain" as of June 3, when it arguably reached a binding and enforceable settlement with the Wolfes. In view of that settlement, the policy reasons for adopting the *Amfac* rule in a nonsettlement context are either inapplicable or much less cogent here.

¶11        For example, when the underlying case is not settled, a malpractice plaintiff's injury or damages may not be fully "ascertainable until the appellate process is completed or is waived by a failure to appeal." *Amfac II*, 138 Ariz. at 154, 673 P.2d at 794. But that concern evaporates when a settlement of the underlying case effectively waives any appeal therein and, thus, eliminates any possibility of the malpractice damages changing. *Id.* at 154 n.2, 673 P.2d at 794 n.2. In other words, when the underlying case is settled, there is no prospect of "successful prosecution of an appeal [in that case] and ultimate vindication of the attorney's conduct by an appellate court." *Amfac I*, 138 Ariz. at 156, 673 P.2d at 796.

¶12        Moreover, in a nonsettlement context, it generally "is only when the litigation is terminated and the client's rights are 'fixed' that it can safely be said that the lawyer's misdeeds resulted in injury to the client." *Id*. at 157, 673 P.2d at 797. In a case such as this, however, a trier of fact might find that a binding and enforceable oral settlement of the underlying case "'fixed'" the client's rights and immediately "resulted in injury to the client," notwithstanding the

6

need for future documents, filings, procedures, and even bankruptcy court approval to finalize the settlement. *Id.*

¶13 Finally, the concerns in *Amfac I* about "preserv[ing] the essential element of trust in the attorney-client relationship" are dubious here, inasmuch as Penn-America retained and utilized several new attorneys to represent itself and Pena Blanca in conjunction with the settlement meeting on June 3, for follow-up negotiation and drafting of settlement documents and for securing bankruptcy court approval. *Id.* at 159, 673 P.2d at 799. Moreover, after June 3, Penn-America used Althaus only for a few ministerial tasks in finalizing the settlement and obtaining dismissal of the wrongful death action.

¶14 We therefore agree in principle with Althaus that *Amfac*'s final judgment rule does not necessarily control a malpractice case such as this in which the underlying case has been settled. That conclusion, however, does not fully resolve the statute of limitations issue here. In our view, the dispositive issue is whether, more than two years before Penn-America filed its malpractice action against Althaus, Penn-America and the Wolfes had reached a binding, enforceable settlement in the wrongful death case, notwithstanding the need to formalize and finalize the settlement. On this record, that issue cannot be determined as a matter of law.

¶15 Viewed in the light most favorable to Althaus, *Walk*, the record supports a finding that the Wolfes and Penn-America reached a settlement in the wrongful death case on June 3 in an amount that was certain, ascertainable, and nonspeculative, albeit subject to several contingencies noted in ¶¶6-7 above, including the drafting and execution of a formal settlement agreement with acceptable release and confidentiality provisions and bankruptcy court approval of the settlement. Notwithstanding those conditions, all of which ultimately were satisfied, a trier of fact could find that both the fact and amount of Penn-America's damage caused by Althaus's

alleged malpractice were established on June 3 and that Penn-America had actual knowledge of such damage on that date. Thus, at least in its present posture, this case "presents the factual question whether the parties intended the [June 3] oral agreement to be binding and enforceable at that time," with the subsequent settlement documents and bankruptcy court approval merely required to memorialize and finalize the oral agreement. *Tabler v. Industrial Comm'n*, 202 Ariz. 518, ¶7, 47 P.3d 1156, ¶7 (App. 2002); *see also Schade v. Diethrich*, 158 Ariz. 1, 760 P.2d 1050 (1988); *AROK Constr. Co. v. Indian Constr. Servs.*, 174 Ariz. 291, 848 P.2d 870 (App. 1993); *Fotinos v. Baker*, 164 Ariz. 447, 793 P.2d 1114 (App. 1990).

¶16        We also disagree with the respondent judge's conclusion that, as a matter of law, the June 3 settlement agreement "made clear that approval was a contingency and not a condition subsequent." Unlike the respondent judge, we do not view the record as supporting only that conclusion. "'A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'" *AROK Constr. Co.*, 174 Ariz. at 296 n.4, 848 P.2d at 875 n.4, *quoting* Restatement (Second) of Contracts § 224 (1981). Although bankruptcy court approval clearly was required to trigger the settlement parties' obligations to perform, when the record is viewed in the light most favorable to Althaus, a trier of fact could find that the parties had reached a binding, enforceable settlement on June 3, with performance delayed until bankruptcy court approval.[2] *Cf. Taylor v. State Farm Mut. Auto. Ins.*

_____

[2]Although the respondent judge's ruling did not address Penn-America's arguments that any alleged settlement on June 3, 1999, was unenforceable because it failed to comply with either the statute of frauds, A.R.S. § 44-101(4), or Rule 80(d), Ariz. R. Civ. P., 16 A.R.S., Pt. 2, we find those contentions unpersuasive. The underlying case is not an action "brought . . . [u]pon a contract to sell or a sale of goods or choses in action." § 44-101(4). Moreover, Penn-America fully performed its settlement obligations. *Cf. Gene Hancock Constr. Co. v. Kempton & Snediger Dairy*, 20 Ariz. App. 122, 125, 510 P.2d 752, 755 (1973) ("[I]n a proper case part performance can remove the prohibition of the statute [of frauds]."). And, although Rule 80(d) generally

*Co.*, 175 Ariz. 148, 159, 854 P.2d 1134, 1145 (1993) (because contract language was reasonably susceptible to differing interpretations and "extrinsic evidence established controversy over what occurred and what inferences to draw from the events, the matter was properly submitted to the jury"); *Muchesko v. Muchesko*, 191 Ariz. 265, 268, 955 P.2d 21, 24 (App. 1997) ("Courts may look at the writing, the conduct of the parties, and the surrounding circumstances in deciding whether a contract existed or whether a meeting of the minds occurred."). And, if such approval were not obtained, the agreement would not necessarily lack binding and enforceable effect in the first instance.

¶17          "The standard for contract enforceability is not whether the agreement included a resolution of every matter and anticipated every contingency." *AROK Constr. Co.*, 174 Ariz. at 297, 848 P.2d at 876. Indeed, "'[t]he fact that one of [the parties], *with the knowledge and approval of the other*, has begun performance is nearly always evidence that they regard the contract as consummated and intend to be bound thereby.'" *Schade*, 158 Ariz. at 10, 760 P.2d at 1059, *quoting* 1A Corbin, *Corbin on Contracts* § 95 at 407 (1963) (emphasis in *Schade*). On this record, a trier of fact could find that the performance of counsel for the Wolfes and Penn-America after June 3, including their execution of the settlement and release agreement, the procurement of bankruptcy court approval, and the dismissal with prejudice of the wrongful death action, demonstrated their understanding and intent that they had reached a binding, enforceable settlement on that date.

---

applies to settlement agreements, this is not a situation in which the parties disputed the existence and terms of the settlement agreement or the authority of the parties' representatives to settle the wrongful death case. *Compare Canyon Contracting Co. v. Tohono O'Odham Housing Auth.*, 172 Ariz. 389, 837 P.2d 750 (App. 1992), *with Hays v. Fischer*, 161 Ariz. 159, 777 P.2d 222 (App. 1989).

¶18        In cases such as this, in which "a professional's services have failed to produce the desired result or may even have brought about an adverse result," "it is often the rule that . . . the question of accrual is for the jury." *Walk*, 202 Ariz. 310, ¶17, 44 P.3d 990, ¶17. And,

> in cases in which the parties to an oral agreement contemplate the later execution of a written document, the fact-finder must resolve whether the parties intended the written document to be a mere memorialization of an already binding oral agreement, or whether they intended to be bound only upon execution of a formal, written instrument.

*Tabler*, 202 Ariz. 518, ¶11, 47 P.3d 1156, ¶11. The same can be said when, as here, the oral settlement is to be followed by the parties' execution of formal settlement, release, and dismissal documents and obtaining of court approval. Concluding that this record does not at this stage permit summary resolution of the limitations issue as a matter of law, we vacate that portion of the respondent judge's order of June 18, 2002, granting Penn-America's cross-motion for summary judgment and striking Althaus's limitations defense.


                                    _____
                                      JOHN PELANDER, Judge

CONCURRING:


_____
PHILIP G. ESPINOSA, Chief Judge



_____
WILLIAM E. DRUKE, Presiding Judge