305 P.3d 392

**Martina Ramos MELENDEZ, Plaintiff/Appellant,**

v.

**HALLMARK INSURANCE COMPANY, a foreign corporation, Defendant/Appellee.**

**No. 1 CA–CV 12–0141.**

Court of Appeals of Arizona, Division 1, Department D.

June 11, 2013.

As Amended June 11, 2013.

rejecting them, which he states he seeks to preserve for federal review. We decline to revisit these claims.

**328**

Warnock, MacKinlay & Carman, P.L.L.C. By Brian R. Warnock and Krista M. Carman, Prescott, Attorneys for Plaintiff/Appellant.

Lewis Law Firm, P.L.C. By Robert K. Lewis and Terry Wayne Straughn, Phoenix, Attorneys for Defendant/Appellee.

## OPINION

KESSLER, Judge.

¶ 1 Plaintiff/Appellant Martina Ramos Melendez ("Melendez") appeals the superior court's grant of summary judgment in favor of Defendant/Appellee Hallmark Insurance Company ("Hallmark"). The court held that the form Hallmark used to offer Melendez uninsured and underinsured motorists coverage ("UM" and "UIM") complied with Arizona Revised Statutes ("A.R.S.") section 20–259.01 (Supp. 2012).[1] We hold that the offer did not comply with the statute because it did not include any information about any premium for UM and UIM coverage and thus could not create a binding contract if Melendez had accepted such coverage. Accordingly, we reverse the judgment and remand this case to the superior court with instructions to enter summary judgment in favor of Melendez.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 The material facts are not in dispute. Melendez owned a vehicle insured by Hallmark when she and two passengers (C.G. and L.C.) were involved in a collision. As a result of the collision, Melendez sustained injuries resulting in nearly $36,000 in medical expenses. L.C.'s medical bills totaled about $5500, and C.G.'s medical bills were more than $95,000. The motorist at fault for the collision carried insurance liability with limits of $50,000/$100,000, and compensation was allocated as follows: Melendez ($50,000); L.C. ($10,000); and C.G. ($40,000).

¶ 3 Melendez filed a UIM claim with Hallmark. Hallmark denied compensation on the basis that Melendez had executed a form rejecting UM/UIM coverage. Melendez then

---

1. The statute was last amended in 2003, however, because the last bound volume of the Arizona Revised Statutes in which this statute appears is 2002, we cite to the 2012 pocket part.

filed a complaint against Hallmark asserting that she is entitled to UIM coverage.[2] After Hallmark answered and denied the allegations, Melendez filed a motion for partial summary judgment maintaining that she was not offered UM/UIM coverage because the form did not provide adequate information to accept or reject the offer of coverage. Melendez argued that "[t]he bare UIM/UM Selection Rejection Form with no premium quotes ... does not adequately offer insurance pursuant to [A.R.S. § 20–259.01], and does not comport with the [Arizona] Department of Insurance'[s] own directive (see [A.R.S. §§ ] 20–398 [ (Supp.2012) ] and 20–1111 [ (2010) ] ) and Regulatory Bulletin 2003–3." Relying on *Tallent v. National General Insurance Company*, 185 Ariz. 266, 915 P.2d 665 (1996), Melendez asserted that "[a]n offer must contain 'definite terms,' including terms that enable the offered to assent to such definite terms" and that "[t]he absence of the definite term of the 'offer' (i.e. the premium) preclude[d] the Selection Rejection Form from constituting an 'offer' pursuant to [A.R.S. § 20–259.01]."

¶ 4 In support of her motion, Melendez attached the declarations page of her Hallmark insurance policy reflecting her premium and coverages including the rejection of UM/UIM coverage, as well as the UM/UIM selection/rejection form she signed in 2009. That form generally described UM/UIM coverage, but did not include any coverage amounts or premiums, and expressly provided that "no coverage is provided by this document." It then suggests the insured contact Hallmark "or your agent" if the insured has any questions about UM/UIM coverage and/or the amount of coverage available. Hallmark's form specifies that Hallmark "will provide Uninsured/Underinsured Motorist coverage in the same amount as the policy's Bodily Injury Liability Limit" unless the insured rejects coverage or selects a lower amount of coverage. Melendez also attached a 2010 letter from the Arizona Department of Insurance ("ADOI") informing Hallmark that the UM/UIM selection/rejection form submitted to ADOI failed to conform to the sample forms in ADOI's

Regulatory Bulletin 2003–03. The letter informed Hallmark that ADOI was giving it an opportunity to cure deficiencies or withdraw the filing. Citing A.R.S. §§ 20–398(A) and –1111, ADOI warned that if Hallmark did not comply, it would "disapprove the filing as ambiguous, misleading or deceptive or otherwise failing to comply with Arizona law." According to ADOI, the UM/UIM form was deficient, in part, because:

> The submitted forms do not comply with Arizona statutes ... The UNINSURED AND UNDERINSURED MOTORIST COVERAGE SELECTION FORM fails to conform to the forms included in our Regulatory Bulletin 2003–03. The form must include the company name and essentially the same information as the form included with the [Regulatory Bulletin 2003–3] (including Bodily Injury Limit on the policy and a place to show the premium for [UM and UIM] Coverages).

¶ 5 Hallmark simultaneously responded to Melendez's motion for partial summary judgment and filed a cross-motion for partial summary judgment. Although Hallmark expressly agreed with Melendez's statement of material facts, it maintained that A.R.S. § 20–259.01(B) does not specify anything other than that a "written offer" must be made to the insured and noted that the statute does not define what constitutes an "offer." Relying primarily on *Tallent*, 185 Ariz. at 267–68, 915 P.2d at 666–67, and *Garcia v. Farmers Insurance Company of Arizona*, 191 Ariz. 410, 411–12, 956 P.2d 537, 538–39 (App.1998), Hallmark maintained that its selection/rejection form was a valid offer of UM/UIM coverage. Hallmark argued that common-law contract principles do not govern what constitutes a valid offer and that its offer was valid because a premium quote is not necessary to offer UM/UIM coverage under A.R.S. § 20–259.01. Hallmark did not dispute Melendez's assertion that ADOI disapproved of Hallmark's UM/UIM form, but rather argued that under A.R.S. § 20–259.01 it was not required to make an offer on an ADOI approved form. Hallmark maintained that the use of an ADOI approved form was

---

**2.** Melendez's complaint also sought class action status. That issue is not a subject of this appeal.

an acceptable, but not mandatory, method of offering UM/UIM coverage.

¶ 6 The superior court determined that under *Garcia*, Hallmark's selection/rejection form was sufficient enough for an offer because it stated that Melendez had the right to get UM/UIM coverage in an amount equal to her liability limits, permitted the selection of lower limits, and permitted rejection of the coverage. The court did not think that the determination in *Garcia* was inconsistent with the statute and stated that "if I were writing [on] a blank page, I am not sure that that is how I would do it, but I think I am bound by *Garcia.*" Accordingly, the court granted Hallmark's motion and denied Melendez's motion. Melendez filed a notice of appeal. Thereafter, the superior court entered a final signed judgment. Melendez filed an amended notice of appeal from the final signed judgment. We have jurisdiction pursuant to A.R.S. § 12–2101(A)(1) (Supp. 2012).

## ISSUE ON APPEAL

¶ 7 Melendez contends that the selection/rejection form for UM/UIM insurance coverage did not constitute an "offer" for purposes of A.R.S. § 20–259.01 because it failed to quote a premium price for the coverage and therefore lacked a certain and definite term necessary for a valid "offer" as that term has been defined by the Arizona Supreme Court. Melendez argues that because a premium was not quoted in the selection/rejection form she did not have adequate information to accept or reject the offer of UM/UIM coverage.

¶ 8 Hallmark maintains that the selection/rejection form provided sufficient information to hold out UM/UIM coverage such that a reasonable person would have understood the coverage was being offered for purchase and to trigger Melendez to ask questions such as the premium amount.

## DISCUSSION

¶ 9 We review *de novo* whether summary judgment is warranted including whether any genuine issues of material fact exist and whether the superior court properly applied the law. *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, 130, ¶ 4, 7 P.3d 136, 139 (App.2000). We construe all facts in favor of the nonmoving party. *Yollin v. City of Glendale*, 219 Ariz. 24, 27, ¶ 6, 191 P.3d 1040, 1043 (App. 2008). We will affirm the superior court if its determination "is correct for any reason, even if that reason was not considered" by the court. *Hill v. Safford Unified Sch. Dist.*, 191 Ariz. 110, 112, 952 P.2d 754, 756 (App.1997); *accord Gary Outdoor Adver. Co. v. Sun Lodge, Inc.*, 133 Ariz. 240, 242, 650 P.2d 1222, 1224 (1982) (stating "trial court will be affirmed when it reaches the correct conclusion even if it does so for an incorrect reason").

¶ 10 We review issues of statutory construction *de novo*. *Blevins v. Gov't Emps. Ins. Co.*, 227 Ariz. 456, 459, ¶ 13, 258 P.3d 274, 277 (App.2011). In construing a statute, we attempt to give effect to the legislative intent and, if the statutory language is clear and unambiguous, we should not look beyond that language but simply apply it on the assumption that the legislature meant what it said. *Id.* In construing statutory language, we use the common meanings of terms that are not defined by statute. *Id.* Section 20–259.01 is a remedial statute meant to encourage drivers to obtain UM and UIM insurance and is thus read liberally to "guarantee that responsible drivers will have an opportunity to protect themselves and their loved ones as they would others." *Id.* at ¶ 14 (citations and internal quotation marks omitted). Accordingly, we require strict compliance with A.R.S. § 20–259.01. *Id.* at 460, ¶ 14, 258 P.3d at 278. In construing and applying a statute dealing with offers of insurance, we can and should incorporate contract principles since an insurance policy is a contract. A.R.S. §§ 20–103(A) (Supp.2012) (" 'insurance' is a contract"), –104 (2002) (defining insurer as "every person engaged in the business of making contracts of insurance"); *see also Tallent*, 185 Ariz. at 267–68, 915 P.2d at 666–67 (holding that the term offer was not defined by statute and in construing term, court would be guided by general contract principles).

## I. Hallmark's Form Did Not Make a Binding Offer

¶ 11 Section 20–259.01(B) requires that an insurer must "make available ... and shall by written notice *offer* the insured ... underinsured motorist coverage." (Emphasis added.) [3]

 ¶ 12 Melendez asserts that because Hallmark's UM/UIM selection/rejection form did not quote a premium price, she was not offered UM/UIM coverage within the meaning of the statute.[4] We agree. Based on the contract principles governing an "offer" for purposes of A.R.S. § 12–259.01 enunciated in *Tallent,* 185 Ariz. at 267–68, 915 P.2d at 666–67, and *Ballesteros v. American Standard Insurance Company of Wisconsin,* 226 Ariz. 345, 348–49, ¶¶ 13–14, 248 P.3d 193, 196–97 (2011), the form here does not constitute an offer of UM/UIM coverage. While *Garcia* is distinguishable for the reasons stated below, insofar as our holding conflicts with *Garcia,* we disagree with *Garcia* because a valid written offer of UM/UIM coverage for purposes of A.R.S. § 12–259.01 must include premium prices for the amount of coverage requested and is not binding until the premium is communicated and agreed upon.

¶ 13 Our supreme court in *Tallent* explained that the term "offer" in A.R.S. § 12–259.01 was not defined by statute, and applied general contract principles in construing the term. 185 Ariz. at 267–68, 915 P.2d at 666–67. Specifically, *Tallent* stated:

to make an offer is simply "[t]o bring to or before; to present for acceptance or rejection; to hold out or proffer; to make a proposal to; to exhibit something that may be taken or received or not." Black's Law Dictionary 1081 (6th ed.1990); *see* Joseph M. Perillo, Corbin on Contracts § 1.11 (revised ed.1993) ("*An offer is an expression by one party of assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express assent to the same terms.*"); Restatement (Second) of Contracts § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.").

*Id.* (emphasis added).[5]

¶ 14 Recently, in *Ballesteros,* our supreme court approvingly cited *Tallent* and elaborated upon the definition of an "offer" stating that: "[In *Tallent,*] [w]e cited with approval the Second Restatement of Contracts' [§ 24] definition of an offer as 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that *his assent to that bargain is invited and will conclude it.*' " 226 Ariz. at 348, ¶ 13, 248 P.3d at 196 (quoting *Tallent,* 185 Ariz. at 268, 915 P.2d at 667) (emphasis added). *Ballesteros* determined that whether an offer for purposes of A.R.S. § 20–259.01 has been made depends on "*whether a reasonable per-*

---

3. Section 20–259.01(B) provides:

 Every insurer ... shall also make available ... and *shall by written notice offer* the *insured and at the request* of the insured shall include within the policy underinsured motorist coverage which extends to and covers all persons insured under the policy, in limits not less than the liability limits for bodily injury or death contained within the policy. The selection of limits or rejection of coverage by a named insured or applicant on a form approved by the director shall be valid for all insureds under the policy.

 (Emphasis added.) The current statutory language is substantially the same for uninsured motorist coverage. *See* A.R.S. § 20–259.01(A).

4. Melendez also argues on appeal that the selection/rejection form "does not comport with the form mandated by the [ADOI] and hence voids" Melendez's rejection of coverage. To the extent

her argument is that a UM/UIM selection/rejection form must be approved by ADOI, we disagree. *See Ballesteros v. Am. Standard Ins. Co. of Wis.,* 226 Ariz. 345, 349–50, ¶¶ 20–21, 248 P.3d 193, 197–98 (2011). To the extent Melendez's assertion is that the UM/UIM selection/rejection form is not sufficiently similar to the ADOI sample form in Regulatory Bulletin 2003–03, we agree for the reasons stated *infra.*

5. In *Tallent* the court determined that an insurer is not required to provide an explanation of the nature of UIM coverage, and that such a requirement was unwise because it might cause additional litigation regarding the adequacy of such explanations. 185 Ariz. at 268, 915 P.2d at 667 ("[A] shorthand definition of UIM ... would inevitably lead to claims that insurers had inadequately explained all the ramifications of UIM coverage or the lack thereof calling for yet further explanations.").

*son would understand that an offer has been made and that, upon acceptance, the offeror would be bound."* *Id.* (emphasis added). *Ballesteros* explained that:

> Under contract principles ... the test is objective: [w]hether an offer was made turns only on whether a reasonable person would understand that a proposal of terms was made, not on [the insured's] subjective understanding of the offer form. The offeree need not understand the content of an offer in order to bind the offeror.... [Section] 20–259.01 ... requires only that the insurer make an offer that, *if accepted, would bind the insurer to provide the offered coverage.*

*Id.* at 349, ¶ 14, 248 P.3d at 197 (emphasis added).[6]

¶ 15 The form used here, attached as Appendix A to this decision, indicates that the UIM coverage is available for purchase at liability limits equal to or less than the insured's policy liability limits. An insured who wants to select coverage at an amount less than the policy limits may specify an amount of desired coverage on a per person/occurrence basis. The form also provides the option of entirely rejecting UIM coverage.[7] In addition, the form provides space next to each option for the insured to select the desired option and a place to initial the selection. However, the form does not include any space for inserting a premium amount for the optional but unstated selected coverage amounts and states that "no coverage is provided by this document." The form is similar to the sample form attached to ADOI Regulatory Bulletin 2003–03 except the Hallmark form lacks premium prices, does not include a blank space wherein a premium price may be listed and states that signing the form does not provide coverage.[8]

¶ 16 A UM/UIM selection/rejection form that lacks premium prices and optional coverage amounts, and which tells the insured that the form does not provide coverage, does not objectively communicate a "proposal of terms" and would not lead a reasonable person to understand that an offer is being made that, if accepted, would bind the offeror. *See id.* at 348, ¶ 13, 248 P.3d at 196. Such a form does not manifest a willingness to enter into a bargain such that an insured would be justified "in understanding that ... assent to th[e] bargain is invited and will conclude it." *Id.* (citing *Tallent*, 185 Ariz. at 268, 915 P.2d at 667). The Hallmark form does not sufficiently offer UM/UIM coverage because it does not convey "an expression by one party of assent to *certain definite terms,* provided that the other party involved in the bargaining transaction will likewise express assent *to the same terms." Tallent*, 185 Ariz. at 268, 915 P.2d at 667 (quoting Joseph M. Perillo, Corbin on Contracts § 1.11 (revised ed.1993)).

¶ 17 Our determination is also supported by ADOI's interpretation of A.R.S. § 20–259.01 as reflected in the ADOI Regulatory Bulletin 2003–03 and the 2010 letter of non compliance ADOI sent to Hallmark. The Director of Insurance administers ADOI and is responsible for enforcing Arizona insurance laws. A.R.S. §§ 20–101 (2002), –141 (Supp.2012), –142 (Supp.2012). As such, the Director has been given broad powers to implement and enforce insurance laws. *Id.* As pertinent here, the legislature specifically invoked the Director's authority to promulgate UM/UIM rejection/selection forms by providing that the "rejection of coverage by a named insured or applicant on a form approved by the director is valid for all insureds under the policy." A.R.S. § 20–259.01(A). Furthermore, the legislature has

---

6. In both *Ballesteros* and *Tallent,* the supreme court did not reach the issue of whether an insurer's offer must list the premium to be charged for UIM or UM coverage. *See Ballesteros,* 226 Ariz. at 346–47, ¶¶ 1, 6, 248 P.3d at 194–95; *Tallent,* 185 Ariz. at 267, 915 P.2d at 666. That issue was not before the court. In *Tallent,* premium prices and spaces to choose the coverage and corresponding premiums were included on the selection/rejection forms. 185 Ariz. at 268, 915 P.2d at 667.

7. The selection/rejection form includes the same options for UM coverage.

8. The superior court took judicial notice of the ADOI Regulatory Bulletin 2003–03 and noted that "the [ADOI sample] form ... actually has blanks in it for the [premium] amounts."

given the Director broad authority to approve or disapprove any "policy form applying to insurance." *See* A.R.S. §§ 20–398, – 1111.

¶ 18 "Judicial deference should be given to agencies charged with the responsibility of carrying out specific legislation...." *U.S. Parking Sys. v. City of Phoenix,* 160 Ariz. 210, 211, 772 P.2d 33, 34 (App.1989). We therefore afford great deference to ADOI's interpretation of this statute as it has been charged with enforcing it, *see id.,* although the court is the final authority on issues of statutory construction. As an exhibit to her motion for summary judgment, Melendez attached a 2010 letter from ADOI to Hallmark wherein Hallmark was warned that its UM/UIM selection/rejection form was not compliant with Arizona law because it lacked a place for premium prices. *See supra* ¶ 4. The ADOI letter clearly informed Hallmark that ADOI would disapprove the form pursuant to its authority in A.R.S. §§ 20–398(A) and –1111.[9]

¶ 19 Our interpretation of A.R.S. § 12–259.01 is consistent with the stated purpose of the statute, which we must read liberally and must be strictly complied with to effect the legislative intent to encourage potential insureds to obtain UM and UIM coverage to protect their loved ones. *See supra* ¶ 10.

Hallmark's interpretation of the statute conflicts with those standards. By Hallmark's reading of the statute, a reasonable person who might want to buy UM/UIM insurance could conclude that he and the proposed insurer were bound simply by the insured inserting a number in the blank for the amount of UM/UIM coverage without any space for the insurer to inform the insured the amount of the premium and when the form says it does not provide coverage. By that reasoning, a lawyer attempting to buy malpractice insurance and the insurer would be bound by an application for insurance in which the premium was left blank and might be dependent on the amount of coverage and/or the purchaser's risks. Moreover, unlike purchasing a can of soup or a car, for which a buyer can read the pricing labels and at least know what he or she is buying, when purchasing Hallmark's UM/UIM insurance, the person desiring insurance would be left totally in the dark about the price to make a final decision. Instead, Hallmark requires the insured to ask about the price. But that does not constitute an offer as defined in *Tallent* and *Ballesteros.* By doing nothing more than indicating an amount of possible coverage, a reasonable buyer would not expect that he or she and the insurer would be bound by the contract until a price was offered and accepted.[10] This is underscored by

9. Section 20–398 is entitled "Policy forms; approval or disapproval; exemption" and subsection A states in relevant part:

[N]o policy form applying to insurance on risks or operations covered by this article may be delivered or issued for delivery unless the form has been filed with the director and either the director has issued, within thirty days, an order affirmatively approving or disapproving the form or, the thirty day period has elapsed and the director has not disapproved the form as ambiguous, misleading or deceptive.

Section 20–1111 is entitled "Grounds for disapproval of forms" and subsection A states in relevant part:

The director shall disapprove any form of policy, application, rider or endorsement or withdraw any previous approval thereof only:
1. If it is in any respect in violation of or does not comply with this title.
2. If it contains or incorporates by reference any inconsistent, ambiguous or misleading clauses, or exceptions and conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract.

3. If it has any title, heading or other indication of its provisions which is misleading.
4. If the purchase of such policy is being solicited by false, deceptive or misleading advertising matter, sales material or representations.

10. We recognize that under certain circumstances, a court may enforce a contract when the price term is missing from the agreement. *See Triangle Const. v. City of Phoenix,* 149 Ariz. 486, 491, 720 P.2d 87, 92 (App.1986) (stating "[w]here a contract price is left to future agreement by the parties and they fail to agree, the price is a reasonable one," and determining court could supply a reasonable price to fill an omitted price term); *see also Goodman v. Physical Res. Eng'g, Inc.,* 229 Ariz. 25, 28, ¶ 7, 270 P.3d 852, 855 (App.2011) ("An agreement can be implied and is enforceable where there is a valid offer and acceptance, and the only term missing is the final price.").

This principle does not apply here, however, because Hallmark does not suggest that a court would determine the premium to be paid by a customer who selects a particular amount of UIM or UM coverage. Moreover, this is not a

the statement in the form that it does not provide UIM coverage. A list of coverage and premium amounts and deletion of the stated language would result in a binding offer once the amounts were chosen.

¶ 20 Our construction of the statute does not conflict with *Ballesteros.* In *Ballesteros,* the supreme court held that the statute did not require an insurer to submit the offer to the buyer in Spanish or another language when the buyer might not be fluent in English. 226 Ariz. at 349–50, ¶¶ 17–18, 22–23, 248 P.3d at 197–98. The court reasoned that nothing in the statute required alternative languages, that inserting such a requirement could require the insurers' agents to determine whether the customer is fluent in English and that such a requirement would be based on the customer's subjective, rather than an objective, understanding of the offer. *Id.* None of these problems are presented here. The statute uses the term "offer," which the supreme court has construed as meaning that a potential objective buyer would understand that acceptance would be binding and the matter concluded. *Id.* at 348–49, ¶¶ 13–14, 248 P.3d at 196–97. Consistent with *Tallent* and *Ballesteros,* construing the statute as requiring notification of the premium to be charged eliminates confusion and promotes certainty in the bargaining process; both parties understand what their obligations are if the coverage is selected. The insurer must insert the premium or provide a coverage/premium schedule so the insured knows that if he selects a certain coverage, the price is fixed and both parties are bound. Finally, our interpretation of "offer" is consistent with what an objective buyer would assume binds the deal—the level of coverage and premium price.

¶ 21 *Garcia* was decided two years after *Tallent.* In *Garcia,* the appellants asserted that the insurer's offer of UM/UIM coverage was inadequate because the selection/rejection form did not specify the limits of coverage available, and unlike the offer of coverage in *Tallent,* the form did not provide a range of coverages and corresponding premium prices. 191 Ariz. at 411, 956 P.2d at 538. Citing the general contract principles adopted in *Tallent,* this Court determined that the election form did " 'bring before' and 'hold out' " UM/UIM coverage to the appellants. *Id.* at 412, ¶ 19, 956 P.2d at 539.

¶ 22 We disagree with the conclusion of *Garcia* and also find it distinguishable. First, fifteen years ago, when *Garcia* decided this issue, this Court did not have the benefit of the guidance afforded by *Ballesteros* or ADOI's interpretation of the statutory requirements as reflected in Regulatory Bulletin 2003–03. Moreover, we cannot see how *Garcia* is consistent with a liberal reading of a remedial statute to encourage potential insureds to explore and purchase UM/UIM coverage. Second, there was no indication in *Garcia* that ADOI had affirmatively disapproved the form used by the insurer. When the administrative agency has construed a statute it enforces and determined that a proposed form is invalid, we will give deference to such determination, although we retain ultimate "authority on critical questions of statutory construction." *U.S. Parking Sys.,* 160 Ariz. at 211, 772 P.2d at 34; *see also Blevins,* 227 Ariz. at 462, ¶ 24, 258 P.3d at 280 (substantive policy statements of ADOI are advisory and to the extent they conflict with judicial interpretation of statute, they are not controlling). Finally, unlike the Hallmark form, the form in *Garcia* did not have language that indicated that even if the insured accepted UM/UIM coverage, no contract was created. 191 Ariz. at 411–12, ¶¶ 9–17, 956 P.2d at 538–39; *see id.* at app.[11]

¶ 23 Our dissenting colleague concludes that since A.R.S. § 20-259.01 does not ex-

case of attempting to enforce a contract to which two parties agreed except for a court determining the price.

11. We also think *Garcia* is distinguishable because there is at least a hint that the insurer sent Garcia the amounts of coverage and corresponding premiums. Garcia chose UM/UIM insurance for reduced coverage "[i]n consideration of the reduction of the premium," 191 Ariz. at 412, ¶ 13, 956 P.2d at 539. This would imply that in sending Garcia the form, the insurer sent her information about the amounts of coverage available and the corresponding premiums. There is no indication that information was communicated verbally and the forms were mailed to Garcia who kept them for several weeks before filling them in. *Id.* at 412, ¶ 22, 956 P.2d at 539.

pressly require the form to include a place for a premium amount, the statute does not require the insurer's form to specify a price. *See infra* ¶ 36. However, that argument ignores the requirements our supreme court set forth in *Tallent* and *Ballesteros*, by which we are bound. In both cases, the court held that the offer must be specific enough to bind the insured on UM/UIM coverage.[12] We assume the supreme court meant what it said.

¶ 24 The dissent contends that the Hallmark form even without any premium price and coverage options, can still bind the insured and the insurer because a price term is not always necessary to create an enforceable contract. *See infra* ¶ 46 (citing *Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 28, ¶ 7, 270 P.3d 852, 855 (App.2011), and *Schade v. Diethrich*, 158 Ariz. 1, 5–11, 760 P.2d 1050, 1054–60 (1988)). Of course, that ignores the language in the form that even if Melendez had selected UM/UIM coverage by filling out the form, the form would not provide such coverage.

¶ 25 Moreover, the dissent's reliance on cases that hold a court or a panel of experts could determine what the premium should be, *id.*, is misplaced because this is not a case such as *Schade*, in which the parties agreed that a panel of experts would determine a reasonable fee for services. 158 Ariz. at 10–11, 760 P.2d at 1059–60. Furthermore, as we have explained at *supra* footnote 10, this is not a case in which the parties agreed to a contract and are seeking enforcement subject to the court determining a price, nor is Hall-

mark suggesting that courts can supply the proper premium amount. For all we know, the premium amount would be based on a number of factors, including the amount of liability coverage, the value of the car, and the insured's risk level. Insurers are better suited than the courts to determine the appropriate premium for UM/UIM coverage. The task of determining the value of or a fair price for such coverage should not be left to the courts to determine in the first instance. Alternatively, if the premium for UM/UIM coverage is merely a factor of the amount of coverage chosen, then it would be rather simple for insurers to include with the application form the premium the insured will have to pay based on the coverage amount chosen to effectively bind the insured with UM/UIM coverage and effectuate the purpose of the UM/UIM statutes to encourage coverage.

¶ 26 Indeed, although the dissent relies on *Tallent*, the insurer's form in that case included a copy of the premium schedule for UM/UIM coverage based on the amount of coverage sought. *See Tallent*, 185 Ariz. at 268, 915 P.2d at 667. This was all Hallmark had to do and it would have avoided the question of sufficiency of an offer. Such a chart would also have avoided the exact concern underlying *Tallent* and *Ballesteros*— that requiring a possibly ambiguous description of coverage or injecting a subjective understanding by the insurer of the insured's English proficiency, would add confusion into whether coverage was offered. Adding a premium price chart based on coverage

---

12. The dissent also contends that in *Tallent* and *Ballesteros* the supreme court refused to impose a requirement that the selection form include an explanation of the nature of UIM coverage or that the form be in Spanish, thus avoiding any requirement not expressly required by the statute. *See infra* ¶¶ 39–40, 44. However, as we explained earlier, the supreme court rejected those requirements because they would add confusion to the possibility of coverage, creating additional questions about the sufficiency of an explanation and the proper language to use based on a subjective understanding of the insured's English proficiency. *See supra* ¶ 20 and footnote 5. That is not the case with a premium price that simply needs to be inserted on a selection form or a separate chart of premium prices based on the amounts of coverage offered as was the case in *Tallent*.

The dissent also relies on *Giley v. Liberty Mut. Fire Ins. Co.*, 168 Ariz. 306, 812 P.2d 1124 (1991), for the principle that the offer must be conveyed to the insured by written notice that is "reasonably calculated to bring to the insured's attention" that UM/UIM coverage is being offered. *Infra* ¶ 34. *Giley*, of course, held that showing a form to an insured while only disclosing UM coverage while the form also provided for UIM coverage and then keeping the form in the company files did not constitute making UIM coverage available for purposes of summary judgment. 168 Ariz. at 306–07, 812 P.2d at 1124–25. To the extent the court in *Giley* defined making available as offering coverage in a way reasonably calculated to bring to the insured's attention that which is being offered, it conflicts with and is not controlling in light of both *Tallent* and *Ballesteros*.

would add certainty to the offer. It would also avoid the confusion caused by requiring the insured to buy a "pig in a poke" with the court being the ultimate entity setting the value of that pig based on some unstated standards. Hallmark chose to not include any premiums or even a blank space for premiums, only adding confusion to whether the offer, if accepted, would be binding. Indeed, the form was not even an "offer" since it expressly told Melendez that her selection of coverage would not provide insurance.

¶ 27 The dissent also contends that regardless of the absence of a price for or amount of coverage, the selection form satisfied the statutory requirements "because it conveyed an offer that, if accepted by the insured, would have bound Hallmark to provide UM/UIM coverage." *Infra* ¶ 41. This ignores the express language in the form that regardless of whether Melendez had chosen UM/UIM coverage in any amount, "This document includes general descriptions of coverage. However no coverage is provided by this document. . . ." *Supra* ¶ 4. We do not understand how a selection form that expressly tells the insured that it does not provide coverage somehow binds the insurer to provide coverage. Nor do we find the dissent's explanation that such language when read in context really only requires the insured to refer to its policy to determine who and what is covered. *Infra* ¶¶ 49–51. Clearly, the form is advising the insured to check the policy for coverage and exclusions. But, it is also telling the insured that regardless of what the insured does on the form, the form does not provide coverage. Thus, it cannot amount to an offer which will bind the insurer to provide coverage.[13]

¶ 28 Finally, the dissent contends that ADOI's rejection of Hallmark's selection form is unclear and to the extent it may have required an explanation of UM/UIM coverage or use of different languages, it is erroneous given *Tallent* and *Ballesteros*. *See infra* ¶¶ 54–55. But that avoids the issue presented here—whether ADOI's requirement that an insurer's form specify either a premium price or a price range is consistent with *Tallent* and *Ballesteros* by requiring a sufficient offer to bind the parties.[14] Thus, the issue is not whether ADOI rejected Hallmark's form because it lacked an explanation of coverage or because of what language it is in. Hallmark's form conflicts with ADOI's requirements as to price of coverage as well as its statement that the form will not provide coverage even if coverage is selected. Providing a form that shows the amounts of coverage and corresponding premiums and informing the insured that choosing an amount of coverage or rejecting coverage is consistent with *Tallent* and *Ballesteros;* it ensures an acceptance will form a binding obligation.

## II. Remedy

■ ¶ 29 Since we conclude that Hallmark's selection form did not comply with A.R.S. § 20–259.01 and there are no disputed facts, Melendez is entitled to summary judgment on her complaint. "When an insurer's statutory obligation to provide or offer cer-

---

**13.** The dissent also notes that there is no realistic danger that an insured would be unwittingly subjected to exorbitant or unfair premiums because ADOI regulates insurance rates and if the customer was dissatisfied once she received a bill for her premium, she could cancel the coverage. *See infra* footnote 17. Assuming without deciding that ADOI has the power to reject UM/UIM rates filed by insurers (A.R.S. §§ 20–342 (Supp. 2012) and 20–382 (Supp.2012)), ADOI may only reject such rates prospectively. *See* A.R.S. §§ 20–358 (2002) and 20–388 (2002). In any event, this does not answer the issue presented— whether Hallmark's UM/UIM form constituted a binding offer if accepted by the insured at any level of coverage selected by the insured up to the amount of liability coverage. Nor does whether an insured has a right to cancel a policy later address whether Hallmark's form constitut-

ed a binding offer of UM/UIM insurance. The right of an insured to cancel insurance, a fact not in the record or at issue here, is different than whether submitting a form which says selection of UM/UIM coverage does not provide coverage, actually binds the insurer.

**14.** The fact that the ADOI form does not have a chart or listing of prices and amounts of coverage is of no matter. The form could not include such a chart or list because the form is generic for all insurers and each insurer might have different UM/UIM premiums. Implicit in the ADOI form which provides blanks for both coverage amounts and premiums is that the insurer will provide those options to the insured with the form.

tain coverage is mandatory, the proper remedy is to include the coverage in the policy by operation of law ... in an amount equal to the bodily injury liability limits of the policy...." *Ins. Co. of N. Am. v. Superior Court,* 166 Ariz. 82, 85, 800 P.2d 585, 588 (1990); *see also Johnson v. Cont'l Ins. Co.,* 198 Ariz. 160, 162, ¶ 11, 7 P.3d 966, 968 (App.2000).

## CONCLUSION

¶ 30 As a matter of law, Hallmark did not sufficiently offer Melendez UM/UIM insurance coverage for purposes of A.R.S. § 20–259.01. The offer did not specify premium amounts such that a reasonable person would understand that choosing an amount of coverage and corresponding premium would bind the parties. It also expressly told Melendez that requesting coverage on the form would not provide coverage. Because Hallmark is not entitled to summary judgment, we reverse the superior court's judgment in Hallmark's favor and remand this case to the superior court with instructions to enter summary judgment in favor of Melendez.

CONCURRING: MICHAEL J. BROWN, Presiding Judge.

GOULD, Judge, dissenting.

¶ 31 I respectfully dissent from the majority's decision. I would affirm the trial court's decision granting summary judgment in favor of Hallmark on the grounds that the plain language of A.R.S. § 20–259.01 does not require Hallmark to include a premium in its UM/UIM selection form.

¶ 32 In reaching my conclusion, I am guided by two well-established principles of statutory construction. First, "[o]ur goal in interpreting statutes is to fulfill the intent and purpose of the legislature." *Garden Lakes Cmty. Ass'n, Inc. v. Madigan,* 204 Ariz. 238, 241, ¶ 14, 62 P.3d 983, 986 (App.2003) (citing *Zamora v. Reinstein,* 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996)). Second, "[w]hen determining the meaning of a statute, we first look to the plain language of the statute as the most reliable indicator of its meaning." *New Sun Bus. Park, LLC v. Yuma Cnty.,* 221 Ariz. 43, 46, ¶ 12, 209 P.3d 179, 182 (App.2009) (citing *Nordstrom, Inc. v. Maricopa Cnty.,* 207 Ariz. 553, 556, ¶ 10, 88 P.3d 1165, 1168 (App.2004)).

¶ 33 When the legislature enacted the current version of A.R.S. § 20–259.01, it recognized that Arizona had "a very real problem" with uninsured and underinsured drivers. *Ormsbee v. Allstate Ins. Co.,* 176 Ariz. 109, 112, 859 P.2d 732, 735 (1993). However, unlike previous versions of A.R.S. § 20–259.01 which mandated that insurance companies provide specified minimum amounts of UM/UIM coverage, the purpose of the current statute is to ensure that responsible drivers "have the *opportunity* to buy uninsured or underinsured motorist coverage" to protect themselves and their loved ones. *Ormsbee,* 176 Ariz. at 112, 859 P.2d at 735 (emphasis added); *Ballesteros v. Am. Standard Ins. Co. of Wis.,* 226 Ariz. 345, 347, ¶ 8, 248 P.3d 193, 195 (2011).

¶ 34 To promote this legislative purpose, A.R.S. § 20–259.01 now places an affirmative duty on insurance companies to "make available" UM/UIM coverage to their insureds by offering to provide UM/UIM coverage. *Ballesteros,* 226 Ariz. at 348, ¶ 11, 248 P.3d at 196. The offer must be conveyed to the insured by a written notice that is "reasonably calculated to bring to the insured's attention" that UM/UIM coverage is being offered. *Giley v. Liberty Mut. Fire Ins. Co.,* 168 Ariz. 306, 812 P.2d 1124 (1991). In addition, the statute "requires that the insurer make an offer that, if accepted, would bind the insurer to provide the offered coverage." *Ballesteros,* 226 Ariz. at 348–49, ¶ 14, 248 P.3d at 196–97.

¶ 35 A.R.S. § 20–259.01 is very specific as to what the insurance company's written offer must contain. The insurance company must offer to provide: (1) UM and UIM coverage, (2) in limits up to, and including, the limits for death/bodily injury under the insured's liability policy, and (3) the coverage must extend to all persons covered under the insured's liability policy. A.R.S. §§ 20–259.01(A), (B). If the insured requests UM/UIM coverage after receiving the offer, the insurance company must provide the requested coverage. *Id.*

¶ 36 Noticeably absent from A.R.S. § 20–259.01 is any requirement that the insurance company include the cost of premiums in its offer. As a result, we have previously decided that A.R.S. § 20–259.01 does not require an insurance company to include the cost of premiums in its UM/UIM offer. *Garcia v. Farmers Ins. Co. of Ariz.*, 191 Ariz. 410, 412, ¶ 19, 956 P.2d 537, 539 (App.1998).

¶ 37 The efforts of my colleagues in the majority to distinguish *Garcia* lack merit. First, they assert that unlike the present case, "there is at least a hint" the insurer sent the insured some premium information. *Supra*, p. 21 at n. 11. I am neither willing nor able to speculate about this fact. There is nothing in the majority or dissenting opinions in *Garcia* to support that they inferred or considered the existence of such a "fact"; rather, their analysis was based on the fact the insurer's offer form contained no information about the cost of UM/UIM coverage. *Garcia*, 191 Ariz. 410, 411–12, ¶¶ 9, 19, 956 P.2d at 538–39 (majority opinion); *Id.*, at 413, ¶ 29, 956 P.2d at 540 (Fidel, J., dissent).

¶ 38 The majority also contends that *Garcia* is distinguishable because there is "no indication" that ADOI "affirmatively disapproved the form used by the insurer." *Supra*, p. 20. I agree that *Garcia* makes no mention of the insurer receiving a non-compliance letter from ADOI. Even though the case is completely silent on this issue, I am willing to assume the insured received no such letter. However, assuming this fact does not mean ADOI approved of the form in *Garcia*, whereas it disapproved of Hallmark's form.[15] Such a conclusion seems suspect when the two forms are compared to each other. The Hallmark form, like the form in *Garcia*, contains no information about the cost of UM/UIM coverage. However, unlike Hallmark's form, the offer form in *Garcia*

contained no description of UM/UIM coverage, no statement the insured had a right under Arizona law to purchase UM/UIM coverage, and no clear indication the insured could purchase UM/UIM coverage in the same amounts as liability coverage under the policy. *Garcia*, 191 Ariz. at 414, app., 956 P.2d at 541.[16]

¶ 39 I see no reason to depart from our decision in *Garcia*, particularly when our supreme court has consistently refused to add requirements to A.R.S. § 20–259.01 that are not specifically listed in the statute. In *Tallent v. National General Insurance Co.*, 185 Ariz. 266, 915 P.2d 665 (1996), our supreme court held that A.R.S. § 20–259.01 does not require the insurance company's offer "to contain an explanation of the nature of UIM insurance." *Id.*, 185 Ariz. at 267, 915 P.2d at 666. The court went on to state that, "[w]e find nothing in [A.R.S. § 20–259.01] justifying the imposition of this additional requirement. If the legislature desires such an addition, it may create one." *Tallent*, 185 Ariz. at 268, 915 P.2d at 667.

¶ 40 In *Ballesteros*, our supreme court addressed whether an offer of UM/UIM coverage to a Spanish-speaking insured must be in Spanish. The court held that A.R.S. § 20–259.01, by its express terms, did not require a Spanish offer form. *Ballesteros*, 226 Ariz. at 349, ¶ 15, 248 P.3d at 197. The court concluded that "[i]f the legislature desires to add such a requirement, it may do so ... but it is not our place to rewrite the statute." *Id.*, 226 Ariz. at 349, ¶ 17, 248 P.3d at 197. *See generally State v. Patchin*, 125 Ariz. 501, 502, 610 P.2d 1062, 1063 (App.1980) (stating that courts are "not at liberty to rewrite the statute under the guise of judicial interpretation"); *City of Phoenix v. Butler*, 110 Ariz. 160, 162, 515 P.2d 1180, 1182 (1973) (citation omitted) ("The choice of appropriate wording

---

15. A.R.S. § 20–259.01 does not require insurers to use forms approved by ADOI, although use of an approved form is considered conclusive evidence the insurer complied with the statute. *Ballesteros*, 226 Ariz. at 350, ¶ 21, 248 P.3d at 198.

16. Hallmark's form also compares favorably with the form approved by our supreme court in *Tallent v. National General Insurance Co.*, 185 Ariz. 266, 915 P.2d 665 (1996). The form in

*Tallent* stated "[T]his form is used for selecting (or changing) your Uninsured/Underinsured Motorist Coverage," followed by a series of boxes to check with corresponding coverage amounts and premiums; the form contained no description of UM/UIM coverage and no statement the insured had a right under Arizona law to purchase UM/UIM coverage. *Tallent*, 185 Ariz. at 268, 915 P.2d at 667, "Appendix A."

rests with the Legislature, and the court may not substitute its judgment for that of the Legislature.").

¶41 Hallmark's UM/UIM selection form satisfied the offer requirements of A.R.S. § 20–259.01 because it conveyed an offer that, if accepted by the insured, would have bound Hallmark to provide UM/UIM coverage. *Ballesteros*, 226 Ariz. at 348–49, ¶14, 248 P.3d at 196–97. Hallmark's form is entitled, in capital letters, "ARIZONA UNINSURED MOTORISTS COVERAGE SELECTION/REJECTION FORM." The form states that "Arizona law permits you [the insured] to make certain decisions regarding Underinsured/Uninsured Motorist Coverage," and provides a short explanation as to the nature of UM and UIM coverage. The form also urges the insured to contact Hallmark "or your agent" if the insured has any questions about UM/UIM coverage and/or the amount of coverage available. Hallmark's form clearly specifies that Hallmark "will provide Uninsured/Underinsured Motorist coverage in the same amount as the policy's Bodily Injury Liability Limit" unless the insured rejects coverage or selects a lower amount of coverage. The form also states that the insured has "the right to purchase" UM/UIM coverage in an amount up to the policy's liability limit. Finally, as to both UM and UIM coverage, Hallmark's form includes a section where the insured may check a box selecting UM/UIM coverage for the full amount of coverage under the insured's liability policy, a box selecting UM/UIM coverage in an amount lower than the liability policy limits, or a box rejecting UM/UIM coverage.

¶42 It is undisputed that when Melendez reviewed this form, she clearly and unambiguously rejected UM/UIM coverage. Melendez initialed the rejection boxes for both UM and UIM coverage, and signed the form at the bottom. Melendez has never alleged she did not understand the form, or that she did not have an opportunity to ask questions about the policy, including questions about the additional price of UM/UIM coverage.

¶43 The majority contends, however, that Hallmark's UM/UIM selection form was too confusing and uncertain to constitute a valid offer because it did not include the cost for premiums. *Supra*, ¶¶16–17, 20, 27. Noting that both *Tallent* and *Ballesteros* applied general contract principles in interpreting the offer requirement of A.R.S § 20–259.01, my colleagues argue that no reasonable person would expect to be bound by an offer that failed to include the cost of premiums. *Supra*, ¶17. My colleagues add that their position is "underscored" by the fact that Hallmark's form expressly states "no coverage is provided by this document." *Id.*

¶44 As a preliminary matter, while it is true both *Tallent* and *Ballesteros* applied general contract principles in interpreting A.R.S § 20–259.01, the supreme court did not use these principles to re-write the statute or add requirements for an "offer" that were not specifically listed in A.R.S § 20–259.01. To the contrary, in both cases the supreme court refused to add any requirement that was not specifically included in the plain language of the statute. *Ballesteros*, 226 Ariz. at 348, ¶13, 248 P.3d at 196; *Tallent*, 185 Ariz. at 268, 915 P.2d at 667.

¶45 More importantly, the validity of Hallmark's offer does not depend upon whether Melendez was confused or uncertain about the cost of premiums. As the supreme court noted in Ballesteros, "[T]he offeree need not understand the content of an offer to bind the offeror." *Ballesteros*, 226 Ariz. at 349, ¶14, 248 P.3d at 197. Thus, the critical inquiry is not whether Melendez understood the terms of Hallmark's offer, or whether she knew what the cost of premiums would be for such coverage; the sole issue is whether Hallmark would have been bound to provide UM/UIM coverage if Melendez had selected such coverage on Hallmark's form. *Ballesteros, Id.*

¶46 In my view, based on the language contained in Hallmark's UM/UIM selection form, if Melendez had checked one of the boxes opting for UM and/or UIM coverage, there is no question Hallmark would have been bound to provide such coverage. *See, supra*, ¶41. This would be the case even though Hallmark's selection form did not contain premium costs. We have repeatedly held that "[a]n agreement can be implied and is enforceable where there is a valid offer

and acceptance, and the only term missing is the final price." *Goodman v. Physical Res. Eng'g, Inc.,* 229 Ariz. 25, 28, ¶ 7, 270 P.3d 852, 855 (App.2011)(citing *Schade v. Diethrich,* 158 Ariz. 1, 5–11, 760 P.2d 1050, 1054–60 (1988)). *See also* Restatement (Second) of Contracts ch. 3, topic 3 § 33, cmt. a (West 2012) ("uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract[,]" provided that "the parties have intended to conclude a bargain."). This premium cost would be easily ascertainable for both the maximum UM/UIM coverage and lesser amounts of coverage based on Hallmark's premium schedule.

¶ 47 The majority expresses concern that an insured who accepts an insurer's offer of UM/UIM coverage without knowing the price will be forced to buy a "pig in a poke," *e.g.,* will be at the mercy of whatever premium the insurer decides to charge.[17] Of course, as noted above, the fact the insured is uncertain about the cost of UM/UIM coverage does not mean the offer is invalid, so long as the insurer is bound to provide the UM/UIM coverage. *Ballesteros,* 226 Ariz. at 349, ¶ 14, 248 P.3d at 197. Thus, in *Ballesteros,* the insurance company's offer of coverage was deemed valid under A.R.S. § 20–259.01 even though the insured was a Spanish speaker who could not understand any of the terms contained in the offer. *Ballesteros, Id.* Likewise, in *Tallent* the insurer's offer of UIM coverage was held to be valid even though the offer form did not contain an explanation of the nature of UIM insurance. *Tallent,* 185 Ariz. at 268, 915 P.2d at 667. It would be an incongruous result to declare that an offer lacking the cost of premiums would be invalid under A.R.S. § 20–259.01, while at the same time holding that offer forms are valid when a person cannot understand a single word of the form and/or has no

idea what kind of insurance is being offered by the form.

¶ 48 When Melendez reviewed Hallmark's UM/UIM selection form, the form provided Melendez with the opportunity to contact Hallmark about the premiums if she had any questions about the cost of premiums. It bears repeating that the purpose of A.R.S. § 20–259.01 is to bring to the insured's attention the *availability* of UM/UIM coverage, and to provide the insured with an *opportunity* to purchase such coverage. A.R.S. § 20–259.01 does not mandate that an insurance company provide UM/UIM insurance unless the insured requests it. *Ballesteros,* 226 Ariz. at 347, ¶ 8, 248 P.3d at 195. Thus, although it is incumbent on an insurance company to offer UM/UIM coverage and to be bound to provide such coverage if the insured requests it, the offer does not change or become invalid simply because the insured makes an inquiry about the cost of premiums before accepting the insurance company's offer.[18] *See Tallent,* 185 Ariz. at 268, 915 P.2d at 667 (in determining whether insurer's written offer form satisfied the "offer" requirement of A.R.S. § 20–259.01, the court stated the insurer's form "certainly seems sufficient to cause any insured or potential insured who has questions about the meaning of UM or UIM coverages to ask for an explanation.")

¶ 49 The majority also claims that Hallmark's form fails to comply with A.R.S. § 20–259.01 because it expressly states, "no coverage is provided by this document." Melendez never raised this argument—not in the trial court or on appeal—and for good reason: when read in context, the subject language simply provides that any UM/UIM coverage selected by Melendez is subject to

17. As a practical matter, I do not believe there is a realistic danger that insureds would be unwittingly subjected to exorbitant or unfair premiums. In fact, Melendez argues that one of the problems with Hallmark's form is that it fails to disclose how relatively "affordable" UM/UIM coverage is, thereby depriving insureds of the opportunity to purchase this "relatively inexpensive" coverage. Moreover, insurance rates are regulated by the ADOI, and cannot be "excessive, inadequate or unfairly discriminatory." *See* A.R.S. § 20–341, *et seq.;* A.R.S. § 20–381, *et seq.*

18. Even if the insured fails to inquire about the premiums before accepting the insurance company's offer, and later finds the cost of premiums to be too high, the insured can simply refuse to pay the premium, resulting in cancellation of the UM/UIM coverage. *See, e.g.,* A.R.S. § 20–267(B) (discussing authority of insurance company to cancel policy for non-payment of premium); A.R.S. § 20–1631(D)(1)(same).

the terms, conditions and exclusions of Melendez' policy.

¶ 50 The language referenced by the majority is contained in one paragraph of the form. Apart from this paragraph, the entire form is dedicated to informing the insured of its right to select UM/UIM coverage. *See supra,* at ¶ 41. The sentence cited by the majority is contained in the paragraph immediately before the paragraph that describes the nature of UM/UIM coverage. The first sentence of the subject paragraph states, "[T]his document includes general descriptions of coverage." The next sentence states, "[H]owever, no coverage is provided by this document, nor is Underinsured coverage included with Uninsured Motorist coverage." The paragraph concludes with the following, "You should read your policy and review your Declarations Page(s) and/or Schedule(s) *for complete information on the coverage you are provided.*" (Emphasis added).

¶ 51 Clearly, the subject sentence, when read together with the sentences that precede and follow it, serves to refer the insured to its policy for a full description of the UM/UIM coverage provided by the policy.[19] *Ballesteros,* 226 Ariz. at 348, ¶ 13, 248 P.3d at 196 (applying general contract principles when interpreting offer requirement under A.R.S. § 20–259.01); *Tallent,* 185 Ariz. at 268, 915 P.2d at 667 (same). Thus, an insured must refer to its policy to determine who is covered by the policy, what type of vehicles are covered, and what type of exclusions may apply to the UM/UIM coverage. The language in question is similar to the language contained in the ADOI form, which states, "[F]or a more detailed explanation of these [UM/UIM] coverages, refer to your policy." This subject language also addresses the concern expressed by our supreme court in *Tallent:* imposing a requirement under A.R.S. § 20–259.01 "for an explanation of coverage is, we believe, both unwarranted under the statute and unwise ... [because] [s]uch shorthand explanations would inevita-

bly lead to claims insurers had inadequately explained all the ramifications of UIM coverage or the lack thereof calling for yet further explanations." *Tallent,* 185 Ariz. at 268, 915 P.2d at 667.

¶ 52 Finally, the majority asserts that ADOI has interpreted A.R.S. § 20–259.01 as requiring the inclusion of premiums, and therefore we should pay deference to ADOI's interpretation. *Supra,* p. 14. The majority premises this argument on ADOI's letter rejecting Hallmarks' UM/UIM form, which states that Hallmark's "forms do not comply with Arizona statutes" because the forms do not have "a place to show a premium." *Supra, Id.* Accordingly, the majority states that because A.R.S. § 20–259.01 is an insurance statute that ADOI is charged with enforcing, we should afford great deference to ADOI's interpretation of the statute. *Supra, Id.*

¶ 53 As a general matter, we should pay deference to ADOI's interpretation of insurance regulatory statutes. However, ADOI's letter does not interpret A.R.S. § 20–259.01. ADOI's letter states, without any explanation, that Hallmark's form does "not comply with Arizona statutes," and that the form "fails to conform to the forms in our Regulatory Bulletin 2003–03."

¶ 54 In truth, it is not even clear what ADOI's basis was for rejecting Hallmark's form. In addition to a lack of space for a premium, ADOI's letter notes that Hallmark's form was rejected because the form, which was "to be used by more than one company," did not list the names of all the companies that were offering coverage, nor did it provide "check boxes or lines ... to indicate which company has been selected to write the [UM/UIM] policy."

¶ 55 I find it particularly confusing that ADOI rejected Hallmark's form based on the recommended forms/guidelines set forth in Regulatory Bulletin 2003–03.[20] As a preliminary matter, Regulatory Bulletin 2003–03

---

**19.** The majority states that "Hallmark's form conflicts with ADOI's requirements as to price of coverage as well as its statement that the form will not provide coverage even if coverage is selected." *Supra,* ¶ 28. However, the ADOI letter does not mention the subject coverage language, nor does it state this language violates Arizona law.

**20.** As referenced in ADOI's letter, Regulatory Bulletin 2003–03 is available at the ADOI's website: http://www.azinsurance.gov.

does not provide an "interpretation" of A.R.S. § 20–259.01, nor does it state that the cost of a premium must be included in a UM/UIM offer.[21] Rather, the Bulletin provides suggested UM/UIM offer forms "that insurers could use to satisfy the requirements of A.R.S. § 20–259.01." While these recommended forms include blanks for premium costs, they also provide (1) an explanation/definition of UM/UIM coverage and (2) a Spanish form. However, both of these "requirements" have been expressly rejected by the supreme court in *Tallent* and *Ballesteros*.

As a result, if the Bulletin's recommended forms do in fact constitute ADOI's interpretation of A.R.S. § 20–259.01, this interpretation is clearly not in accordance with the statutory interpretations by our supreme court.

¶ 56 In conclusion, I would affirm the trial court's judgment granting summary judgment in Hallmark's favor based on the plain language of A.R.S. § 20–259.01. I therefore respectfully dissent from the majority's decision to reverse the trial court's judgment.

---

**21.** In addition, the Bulletin clearly states it is "advisory only." *See Blevins v. Gov't Employees Ins. Co.,* 227 Ariz. 456, 462, ¶ 24, 258 P.3d 274, 280 (App.2011) (ADOI bulletins/policy statements are advisory only).